ALFRED A. LEHMANN *et al.*

*v.*

PAUL ROTHBARTH.

*Filed at Mt. Vernon September 27, 1884.*

.111  185
31a  636
111  185
159  272

111  185
91a  ³167
91a  ⁹168
d91a  ₉169

1. APPEAL—*whether involving a freehold or not.* Where one of the main objects of a bill in chancery is to recover an equitable freehold in land,—or, in other words, to establish a resulting trust in a freehold estate,—a freehold is involved, and this court has jurisdiction of an appeal directly from the trial court.

2. While it is true that a party can not invest this court with original jurisdiction of an appeal by merely alleging facts showing he claims a freehold, without proof tending to establish such claim, yet where there is evidence fairly tending to support such allegation, and the claim is made in good faith, an appeal may. be prosecuted directly to this court.

3. TRUSTS AND TRUSTEES—*agent of a trustee or guardian—when to be held as a trustee.* If an agent of a trustee acts fraudulently and collusively, he may himself be treated as a trustee by construction, and as such held accountable to the *cestui que trust.* If he secures to himself any benefit by a breach of trust, he will be responsible for the property to the party entitled to the beneficial interest. If by an abuse of his power as simple agent he obtains possession of trust property, the *cestui que trust* may proceed against him as a trustee.

4. Where the husband of an administratrix of an estate and guardian of minor heirs, takes upon himself the exclusive control and management of

the estate, excluding his wife from any participation in the same, and makes reports for her, and uses the trust funds, or places them to his own private account, the heirs and minor wards may, in equity, call him to account for the funds, etc., coming into his hands as agent of the administratrix and guardian.

5. SAME—*reports made by husband of a guardian in her name—when may be impeached.* A husband of a guardian, who assumes an exclusive agency of the trust funds and securities of the wards, and makes out reports in his wife's name, not under oath, of the correctness of which she has no knowledge, and is kept ignorant by him, which reports are approved by the probate court, will not be entitled to the same protection under them, when called on by the wards to account, as if made out in his own name, and he was the legal guardian.

6. SAME—*guardian and ward—charge for taxes and repairs of homestead occupied by tenant for life.* Where a husband of a guardian of minor children, who assumed the entire management of the trust estate, in making out reports to the probate court charged the wards with the taxes, and cost of insurance and repairs of the homestead premises, occupied by him for a residence, while his wife and the minors were absent a great part of the time at their own expense, it was *held,* that such charge was unwarrantable, and that in any event they should not have been charged with more than their equitable share of such expenses.

7. SAME—*settlement with ward, after age—when may be opened.* A settlement pressed upon wards about the time of their becoming of age, by one standing *in loco parentis,* and claiming to represent their mother and lawful guardian, from which the latter is forcibly excluded, should not be sustained, except in so far as it is just and fair to them. If based chiefly on improper charges against them, they should not be concluded by it.

8. SAME—*basis for restating account after settlement.* On bill by wards to set aside a settlement made by the husband of their guardian, with them, shortly after their majority, for improper charges in his accounts, etc., on granting the relief prayed, the court, in restating the account, should charge the complainants with all-payments made to them on the settlement, including real estate taken by them at its cash value at the time it was received; but the defendant should not be charged with any subsequent depreciation in its value, and the proof of such property being turned over to the wards at an excessive price should be clear and conclusive.

9. SAME—*trustee, when liable for interest.* Where one chargeable constructively as a trustee, uses the trust funds in his private business, the same as his own, he will be liable for interest on the same.

10. One in the possession of trust funds can not use them in his private business for his own gain, and then relieve himself of liability to pay interest on the same by falsely reporting in his accounting that he has them on hand, and is unable to invest them.

11. EVIDENCE—*bank account to show how much money a depositor has at a given time.* Where it becomes material to show how much ready money a party who keeps a bank account has on hand on particular days, the state of his bank account at the times in question is clearly competent and proper evidence of that fact, and his bank account is admissible on the question.

12. HUSBAND AND WIFE—*when settlement between, opened.* Where a husband comes into the possession and exclusive management of his wife's estate, including her moneys, and practically excludes her for several years from participating in its management and control, and by harsh treatment and cruelty causes her to have a protracted sickness and great despondency, and to file a bill for divorce, he will not be allowed to shield himself from liability to account to her, by a settlement made with her in ignorance of her just rights, when in a condition not capable of entering into a business matter of such importance. Such a settlement is a fraud upon her rights.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

Frederick Lehmann died intestate July 12, 1872, leaving Marie Lehmann, his widow, Ida Cudell, Alfred A., Oscar, Edmund, Emma, Frederick and Justine Lehmann, his only children and heirs at law,—the last two being children by a former wife. The estate of Lehmann, real and personal, amounted to near a half a million of dollars. All the children except Frederick and Justine were minors at the time of Lehmann's decease. On the 7th of August, 1872, Marie was appointed administratrix of the estate and guardian of the minor children, by the county court of Cook county, and she thereupon assumed the duties of these trusts. On the 16th of July, 1873, she presented to the county court her first accounts as administratrix, showing a balance in her hands, after the payment of debts, of $215,936.41. Prior to the rendering of these accounts, to-wit, on the 10th of June, 1873, the said Marie intermarried with Paul Rothbarth, and on the same day Justine Lehmann intermarried with Edward Koch, the partner in business of Rothbarth. In July, 1873, after her marriage, Mrs. Rothbarth turned over the estate to Julius Rosenthal, who, as her agent and attorney, had the exclusive

control and management of it until in March, 1874, when he turned it over to her again, or, rather, to her husband, as her agent. The amount thus turned over to him was over $335,000, all of which was invested in interest bearing securities, except $11,000 in cash, then on hand. These securities were kept in the Fidelity bank, and the cash was on deposit in the International Bank of Chicago, where Rosenthal kept his account, and the estate, in this condition, was turned over to Rothbarth. His wife gave to him the key to the box containing the securities in the Fidelity bank, and the account with the International bank was continued by her husband, in her name, for some time afterwards. He, from time to time, drew checks on the fund in her name, signed by him, as agent. These checks, or at least a part of them, were made payable to his own order, and some of them were deposited to his own account, in his own bank. The business was conducted in this manner until the 9th of November, 1874, when he closed his wife's account with the International bank altogether, by transferring the balance then on hand to his own account with Meadowcroft Bros., his own bankers. The securities not converted or otherwise disposed of, were, as before, kept in the Fidelity bank, in the name of Mrs. Rothbarth, until in 1876, when, at his instance, they were placed in his own name, in a different box, and so continued until in the winter of 1879, when he made a final settlement with his wife respecting her separate estate. He also, about the same time, made a settlement with her as guardian of Edmund and Emma, upon the basis of her accounts as guardian and administratrix, theretofore filed in and approved by the county court, as hereinafter mentioned.

On the 17th of January, 1876, Mrs. Rothbarth made her second, and on the 14th of April her third and final report as administratrix, which were severally approved by the court. Her last report shows that she retained as her distributive share of the estate, $74,992.08, and paid to each of the heirs

$21,426.31. Upon the filing and approval of this report she was discharged as administratrix. Her first report as guardian was made on the 6th day of May, 1876, from which it appears she then had in her hands belonging to the five minor children, the aggregate sum of $223,648.40, the report showing separate accounts with each ward. Her second report as guardian, showing the state of her accounts with her several wards, was filed July 25, 1877, from which it appears she then had in her hands, belonging to them, the aggregate sum of $228,860.23. On the 3d of September, 1879, Mrs. Rothbarth presented to the court her third report, showing the state of her accounts as guardian, and the fact that two of her wards, Alfred A. and Ida, had attained their majority since her last report, and asking to be discharged as guardian as to them. This report and the accompanying accounts were duly approved by the court. On the 9th of December, following, she resigned her guardianship as to Oscar, and one Peter Schuttler was thereupon appointed Oscar's guardian in her stead. Mrs. Rothbarth, on the 12th of the same month, made her last report as guardian of Oscar, showing a balance due him of $43,322.27, and the payment of that sum to her successor, Peter Schuttler, as evidenced by his receipt. In 1879, Rothbarth made a final settlement with Alfred and Ida, on the basis of the guardian reports by his wife, above mentioned, no account being rendered to them by him at the time. In the settlement with them he paid them partly in real estate belonging to himself, partly in property belonging to the estate, and the balance in his own paper.

Shortly after the settlement between Rothbarth and his wife, in December, 1879, with respect to the shares of Edmund and Emma, as above stated, Mrs. Rothbarth commenced proceedings against him for a divorce, which she obtained about the first of March following,—cruelty to her being the ground of the divorce. Pending the divorce suit, and just before it was granted, the parties came to an under-

standing with respect to their affairs, the consummation of which was to be postponed until after the divorce,— and this understanding was subsequently carried into effect, as already stated. As a part of this settlement she released all claims and demands, of whatsoever kind or nature, she might have against him or his estate, the agreement being prepared by his counsel, and executed by her at their instance.

The original bill in this case was filed January 20, 1882, by Alfred A., Oscar, Edmund and Emma Lehmann, and Ida Cudell, against Paul Rothbarth, and Marie Lehmann, their mother. By their bill complainants seek to recover certain real estate, the legal title of which is in Rothbarth, but which, as is alleged, was purchased by him with money belonging to complainants,—or, in other words, complainants seek to establish and enforce a resulting trust with respect to certain real property, the legal title whereof is in Rothbarth. They also seek to compel Rothbarth, as constructive trustee or guardian, to account directly to them for the management and disposition of their estate while under his control, charging that it has been wasted and impoverished by willfully and fraudulently appropriating it to his own use. Marie Lehmann answered, admitting all the material charges in the bill, and also filed a cross-bill, setting up, substantially, the same facts, and praying an accounting as to herself. Answers were filed by Rothbarth to the original bill, and the cross-bill of Mrs. Lehmann. He also filed a cross-bill praying the accounts and reports made in the name of Mrs. Lehmann, as guardian and administratrix, might be approved, and that his title to the real property in controversy be confirmed. The court, upon the hearing, decided in the main adversely to Mrs. Lehmann and her children, and they, by the present appeal, seek a reversal of the decree.

Mr. A. M. PENCE, and Messrs. BUTZ & ESCHENBURG, for the appellants:

A freehold is involved, and hence an appeal lies from the circuit court to this court. *Railroad Co.* v. *Watson,* 105 Ill. 217; *Daly* v. *St. Patrick's Catholic Church,* 6 Bradw. 468.

An agent receiving a personal benefit from the breach of a trust, or where he has not confined himself to the duties of an agent, or where he has fraudulently mixed himself up with the breach of trust, or has accepted a delegation of the whole trust, is liable to account to the beneficiary. Lewin on Trusts, (7th Eng. ed.) 436, 175, 550; Perry on Trusts, secs. 246, 812, 907; *Bodenham* v. *Hoskins,* 2 DeG., M. & G. 902; *Morgan* v. *Stephens,* 3 Giff. 226; *Hardy* v. *Caley,* 33 Beav. 365; *Morgan* v. *Morgan,* 1 Atk. 489; *Davis* v. *Harkness,* 1 Gilm. 173.

A person taking the possession and control of an infant's estate, is liable to account for the same as if a guardian. *Newburgh* v. *Brockerstaff,* 1 Vern. 296; *Van Epps* v. *Van Douser,* 4 Paige, 71; 1 McPherson on Infants, 259; Schouler on Domestic Relations, sec. 371; *Chaney* v. *Smallwood,* 1 Gill, 367; *Perry* v. *Carmichael,* 95 Ill. 519; *Wadsworth* v. *Connell,* 104 id. 369; *Davis* v. *Harkness,* 1 Gilm. 173.

The guardian's accounts are not defendant's, and can not shield him from accounting in his fiduciary capacity. Evans on Agency, *250; 1 Story's Eq. Jur. sec. 465; Pulling on Accounts, *35, 41, 42; *Dennis* v. *McCagg,* 32 Ill. 429.

Guardian's accounts approved during the minority of the ward, are only *prima facie* correct. Schouler on Domestic Relations, sec. 372; *Lynch* v. *Rohan,* 39 Ill. 19; *In re Steele,* 65 id. 622; *Bond* v. *Lockwood,* 33 id. 216; *Bennett* v. *Hanifin,* 87 id. 31.

A guardian is liable if he keeps the money in hand and does not invest it. *McIntyre* v. *People,* 103 Ill. 147; *Wadsworth* v. *Connell,* 104 id. 377.

A person occupying a homestead should be charged with the ordinary running expenses, upon the same principle as a dowress after assignment. *Wheeler* v. *Dawson,* 63 Ill. 54; *Mulhern* v. *McDavitt,* 16 Gray, 404; *Strawn* v. *Strawn,* 50 Ill. 256.

Rothbarth having used and mismanaged the estate for his personal benefit, must account for the commissions received by him. *Bond* v. *Lockwood,* 33 Ill. 216; *Lynch* v. *Rohan,* 39 id. 19.

A guardian, or one acting in such capacity, who relies upon a release or settlement, must show that an account was rendered by him to the ward, and that the ward had a reasonable time to examine the account, and possessed the requisite information, skill and knowledge; and without this the settlement and release will be regarded as an empty form, and leave the case as it was before. There must be an adequate consideration, and the party must be free from duress. 2 Leading Cases in Eq. 1212, 1192, 1246, *596; *Fish* v. *Miller,* 1 Hoff. Ch. 267; *In re Van Horn,* 7 Paige, 46; *Stanley's Appeal,* 8 Barr, 431; *Garvin* v. *Williams,* 44 Mo. 465; *Sullivan* v. *Blackwell,* 28 Miss. 724; *Wills' Appeal,* 10 Harr. 325; *Green* v. *White,* 1 Johns. Ch. 27; 1 Story's Eq. Jur. secs. 317, 339; *Casey* v. *Casey,* 14 Ill. 112; *Dennis* v. *McCagg,* 32 id. 429; *Pennington* v. *L'Hommedieu,* 7 N. J. Eq. 443; *Foshay* v. *Ferguson,* 5 Hill, 158; *Hytton* v. *Hytton,* 2 Ves. Sr. 548.

Mrs. Lehmann, under her cross-bill, is entitled to an account by Rothbarth, as her agent, unless barred by her settlement with him, and her release of March 13, 1880. *Clapp* v. *Emery,* 98 Ill. 523; *Patten* v. *Patten,* 75 id. 466; *Makepeace* v. *Rogers,* 34 L. J. Ch. 306; 1 Story's Eq. Jur. secs. 462, 465; Evans on Agency, sec. 250.

The *onus* is thrown upon the agent of rendering an account to his principal, with the vouchers. Without such fair dealing and full disclosure and statement of accounts, settlements between principal and agent will be set aside. 1 Story's Eq.

Jur. secs. 218, 315, 465; Evans on Agency, *250; Kerr on Fraud, 125, 151; Pulling on Accounts, *41, 42; *Dennis* v. *McCagg,* 32 Ill. 429; *Jenkins* v. *Gould,* 3 Russell's Ch. 386; *Makepeace* v. *Rogers,* 34 L. J. Ch. 306.

The burden of proving the transactions fair, is upon the agent and trustee. *Gibson* v. *Joyes,* 6 Ves. 266; *Billage* v. *Louther,* 9 Hare, 534; *Jennings* v. *McCormick,* 17 Ill. 150; *Jenkins* v. *Gould,* 3 Russell's Ch. 385.

Mr. W. C. GOUDY, for the appellee:

The court erred in admitting the bank account in evidence. The entries in the bank books are nothing more than the declarations of those making them, and mere hearsay. *Barnes* v. *Simmons,* 27 Ill. 512; *Jermain* v. *Worth,* 5 Denio, 342; *Philadelphia Bank* v. *Officer,* 12 S. & R. 49; *Bank* v. *Call,* 5 Fla. 409; *Mudgett* v. *Howell,* 33 Cal. 25.

The orders of the probate court in approving the reports are *res judicata.* Freeman on Judgments, sec. 319; Schouler on Executors and Admrs. secs. 528, 526; *Gates* v. *Treat,* 17 Conn. 388; *Caldwell* v. *Lockridge,* 9 Mo. 362; *Jones* v. *Brinker,* 20 id. 87; *Parker* v. *Bussell,* 11 Cush. 107; *Ordinary* v. *Kershaw,* 14 N. J. Eq. 527; *Debrell* v. *Pouton,* 27 Texas, 623; *Dooley* v. *Dooley,* 14 Ark. 122; *Dickson* v. *Hitt,* 98 Ill. 300.

In some States the rule is applied to partial accounts. *Rhoads' Appeal,* 39 Pa. St. 186; *Cummings* v. *Cummings,* 128 Mass. 532; *Wiggin* v. *Swett,* 6 Metc. 194.

It is ordinarily a good bar to a suit for an account, that the parties have had a settlement. Story's Eq. Jur. sec. 523; *Dawson* v. *Dawson,* 1 Atk. 1; *Chambers* v. *Goldwin,* 9 Ves. 265; *Taylor* v. *Haylin,* 1 Cox, 435; *Belden* v. *Phillips,* 2 Edw. Ch. 1; *Chappedelaine* v. *Dechenaux,* 4 Cranch, 306.

Rothbarth is entitled to the benefit of the accounts rendered in the name of the guardian. An agent employed by a trustee is accountable only to him, and not to the *cestui que trust.* Story on Agency, sec. 217 a; *Megler* v. *Fitzpatrick,* 6 Madd.

360; *Attorney General* v. *Earl of Chesterfield,* 18 Beav. 596; *Lockwood* v. *Abdy,* 14 Sim. 437.

No decree can be founded upon new and distinct matters introduced by a cross-bill, not embraced in the original suit. *May* v. *Armstrong,* 3 J. J. Marsh. 262; *Daniel* v. *Morrison,* 6 Dana, 186; *Gallatin* v. *Erwin,* 8 Cow. 361; *Josey* v. *Rogers,* 13 Ga. 478; *Rowan* v. *Rifle Co.* 33 Conn. 1.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

Upon filing the record in this court, appellee entered a motion to dismiss the appeal for an alleged want of jurisdiction, which was reserved for the hearing.

The question presented by the motion is, whether, under the pleadings and proofs, a freehold is involved, it being conceded there is no other ground upon which the jurisdiction of this court can rest. This question must be answered in the affirmative. One of the main objects of the bill is to recover an equitable freehold in land,—or, in other words, to establish a resulting trust in a freehold estate,—which necessarily involves a freehold. The only answer made to this position is, that there is no evidence in the record tending to establish it, and that it is not within the power of a party to confer jurisdiction upon this court by a mere allegation in the pleadings. The latter branch of the proposition we concede, but do not concur in the view there is no evidence in the record tending to establish the claim of the bill in this respect. Evidence was offered, and considered by the court, on both sides of this question, and so far as we can see, the claim of appellants is made in good faith, upon evidence tending to establish it, and this was sufficient to confer jurisdiction upon this court.

Appellants are met at the threshold of the case with the claim that Rothbarth's only connection with the estate of which an account is sought, was that of a mere agent of his wife, to whom he has already fully accounted. We fully

recognize the general principle here invoked, and the only question is whether it is applicable to a case like the present. The principle in question, like most general rules, has its limitations, which are as well recognized as the rule itself. The general doctrine, with its limitations, is well stated by Perry in his work on Trusts. The author says: "If an agent is employed by a trustee, and thus comes into possession of the property, he will be accountable to his employer, and will not be responsible as a constructive trustee. But if an agent should act fraudulently or collusively, he might be made a trustee by construction, and as such accountable to the *cestui que trust.*" (Sec. 246.) "If an agent secures any benefit from a breach of the trust, he will be responsible for the property to the party entitled to the beneficial interest." (Sec. 813.) "If they mix themselves up with a breach of trust, and by an abuse of their powers as simple agents obtain possession of the trust property, the *cestui que trust* may proceed against them as trustees *de son tort*, or constructive trustees." (Sec. 907.) See, also, to the same effect, Lewin on Trusts, (7th Eng. ed.) 175, 436, 550. The rule, with its limitations, as stated by these authors, is fully recognized by this court in *Davis* v. *Harkness*, 1 Gilm. 173.

The question then recurs, do the proofs bring appellee within any of the exceptions to the general rule that an agent of the trustee can not be required to account to the *cestui que trust* for his management of the trust estate. After a careful consideration of the record we feel constrained to hold that they do. We can not stop to discuss the evidence bearing upon this or other controverted questions of fact involved in the case, nor can we even advert in a general way to all the material parts of it, without extending the opinion in the case beyond all reasonable limits. We must therefore content ourselves with a statement of the general results reached upon matters of mere evidence, with an occasional reference to such parts of the proofs as we think have special significance.

Assuming appellee, under the circumstances shown, may be required to account to the parties in interest for his management of the estate, as we hold he may, it is then claimed the reports and accounts heretofore filed by him in the name of his wife, and approved by the probate court, must be treated as his reports, and that he is entitled to the same protection under them as if they had been made out in his name, and he had been the legally appointed guardian of the children instead of Mrs. Lehmann. In making this statement of appellee's position, of course we do not pretend to give his or his counsel's language, but simply the effect of the claim, as we understand it. There are several serious objections to this view. We think the weight of evidence shows that from the date of the first guardian accounts in 1876, and even during the preparation of those accounts, Mrs. Lehmann had but little to do with the control or management of the estate, and that her knowledge of it was much less. It would appear, from some cause or other,—whether from undue influence, compulsion, or otherwise,—she had at that time, in effect, abdicated her office and trust as guardian, in favor of her husband, over whom she does not seem to have had the slightest supervisory control. It is true, there is considerable evidence in the record that negatives this view, some of which is open to apparently just criticism, and that which is not, we think is overborne by the testimony of more reliable witnesses, and facts about which there is no controversy. Mrs. Lehmann says in her testimony: "Mr. Rothbarth kept charge of my property, and the estate, money and mortgages, from 1874 to December 10, 1879. * * * I did not have the money of the minors during that time. I did not have charge of it at all. I did not have charge of it because Mr. Rothbarth took charge and refused to let me have charge of it. I told him to let me have charge of it, and he said he would never let me have it unless I would force him in court to do so, and if I did, he would burn up everything

before he would render it to me.   We had repeated conversations like this.   I asked him repeatedly to let me have the papers, and let me take care of them, but he refused, and in 1877 I asked him again, but he would not do it, and after I returned from Europe I asked him again, and he said he would never do it unless I enforced it.   That was always the answer he gave me,—that he would burn up everything before he would do it, and make my children beggars.   These conversations were not carried on in a quiet manner, but in a very rude manner.   *   *   *   I signed the accounts now shown me, being the guardian's accounts filed May 6, 1876. Mr. Rothbarth told me to sign them—that they were correct. When I took them in my hands to look them over, he said they were all right,—that they were correct,—and I did not know enough to examine them, to see whether they were correct.   He kept the books and kept the accounts, and as he made them I signed them."

As already appears from the preceding statement, in 1876 Rothbarth took the securities belonging to the estate, out of the box in the vault of the Fidelity bank, in which they had theretofore been, and to which his wife had access, and placed them in another box under his exclusive control, and absolutely refused her all access to them.   At the time of his settlement with Ida and Alfred A., the latter testifies:   "Mr. Rothbarth took us down to his private room, and said he wished to settle our estate; we were to settle with him, and at that time mother stepped into the room to be present and see how things were to be presented.   He took her by the arm and led her out of the room, and said, 'You don't know anything about this estate.   I have been handling it, and I have got the books, and I am going to settle with the children.'" This, to us, looks much like an independent assumption of the duties of guardian, and a repudiation of her rights, as well as his agency.   That Mrs. Lehmann knew but little, if anything, about the correctness of her guardian accounts,

and that they are really the work of Rothbarth himself, and Koch, his confidential friend and partner in business, is also fully borne out by the testimony of Mr. Rosenthal. He says: "When I turned over the securities to Mr. and Mrs. Rothbarth on their return, (from Europe,) I dealt directly with Mr. Rothbarth. * * * I remember the guardian's account rendered in 1876,—that *data* and everything were furnished by Mr. Rothbarth, the amount of receipts and expenditures. I do not suppose Mrs. Rothbarth did anything in regard to it. A great deal of the work in preparing the accounts was done by Mr. Koch." To this he àdds, on cross-examination: "I have no doubt that Mrs. Rothbarth was sometimes at my office. I have no recollection of requiring her presence to do business, except for signatures to the account." With reference to the items included in the account, he says he put in things that were doubtful and things that were improper because directed to do so, that the court might pass upon them. We do not give his exact words, but this is the substance of his statement.

It is clear from all this, the accounts in question were never verified by the oath of any one who understood them, and an analysis of the accounts themselves, in the light of the undisputed facts, shows they are erroneous in many particulars, and to such an extent that it would be difficult, if at all practicable, to separate the proper from the improper items, without a restatement of the whole account. The guardian herself, on subsequent investigation, admits that these accounts are erroneous and unjust as passed by the probate court, and desires they shall be set aside and restated; and that they were thus passed and approved by the court mainly through the instrumentality of Rothbarth, is clear beyond all question, and it is but charitable to add that in obtaining their approval under such circumstances, was an imposition upon the court. These accounts not having been verified by his oath, (the only person who fully understood their real

condition,) we are aware of no principle upon which he can now shield himself behind them, and to permit him to do so, under all the circumstances of this case, would be a travesty on legal justice.

As a single instance, out of many we can not stop to enumerate, of the glaring injustice of these accounts, may be mentioned the fact the children are charged in them with large sums on account of taxes, insurance, and the ordinary repairs of the homestead premises, that brought them no income, and were used and occupied by Mrs. Rothbarth and her husband as a residence. This is particularly true as to Rothbarth, for a large portion of the time Mrs. Rothbarth was in Europe with her children, who were lodged, boarded and educated there at their own expense for most of the time, and even for the small portion of time they lived at the homestead they were charged up in these accounts with their support. In any event, the children should not be charged with more than an equitable portion of these expenses. The general rule unquestionably is, the tenant for life must defray expenses of this character. Other matters equally unfair and improper might be pointed out, but we can not stop to do so.

As the settlement between Rothbarth and Ida and Alfred A., heretofore mentioned, was based chiefly on these erroneous accounts, they should not be concluded by it; and it may be added, the circumstances already stated, under which it was made, afford additional reasons why they should not be so bound. A settlement pressed upon wards about the time of their becoming of age, by one standing *in loco parentis*, and claiming to represent their mother and lawful guardian, from which the latter is forcibly excluded, should not be sustained, except in so far as it is just and fair to them. In restating the account, they must, of course, be charged with all payments made to them, including the real estate taken by them in payment of their interests, respectively, with this qualification: that Rothbarth must make compensation for any loss

they may have sustained by reason of taking property instead of cash, other than loss arising by subsequent depreciation of the property.   If it was put to them at any *material* advance on its then cash value in the condition the property then was, he should make compensation, otherwise not.   The right to compensation, however, should be made out, if such a claim is interposed, by clear and conclusive testimony, so as to leave no well founded doubt of its justness.

The evidence shows, at least the weight of it does, that the individual estate of Mrs. Lehmann and that of her children was treated as a common fund, and that from and after the date of the first guardian's report, Rothbarth treated it precisely as if it belonged to him, or he alone had control over it, and a large portion of the cash was carried to his own bank account, where it was used as his own private fund. This is abundantly shown by the fact the accounts filed in the probate court show large balances on hand, when by reference to his bank account, the correctness of which he does not question, it is demonstrated he had little or nothing on hand, and that his account immediately before and after these settlements was even overdrawn.   Under these circumstances he is clearly liable for interest.   (Perry on Trusts, sec. 468.)   One in the possession of trust funds can not thus use them, and then relieve himself of responsibility by falsely reporting he has them on hand and is unable to invest them.

To the objection the evidence showing the state of Rothbarth's bank account on particular days was improperly admitted, we think there is no merit in it.   When the question how much ready money a party who is shown to keep a bank account has on hand at a particular time, becomes important in a judicial inquiry, the state of his bank account at the time in question is certainly competent evidence upon such an issue; and as to the manner of proving it, we know of no other way more satisfactory than that which was adopted in this case,—namely, by introducing the account itself.   It is

true that in this particular case an examined copy of the account taken from the bank books was used, but it was stipulated the copy was to be treated and given the same effect as the books themselves. That one's bank account is competent evidence for the purpose Rothbarth's was used in this case, is expressly held in *Furness* v. *Cope*, 5 Bing. 114.

With respect to the real estate in controversy there is little to be said. While we think the circumstances tend strongly to show that the funds of Mrs. Rothbarth or of the children, or of perhaps both, were used in paying for the property, we are nevertheless of opinion the evidence, upon the whole, leaves the matter in too much uncertainty to warrant relief in this mode. By requiring appellee to fully account for the estate of Mrs. Lehmann as well as that of her children, which he must do, the ends of justice will be sufficiently and more certainly subserved than to establish a resulting trust with respect to this property.

As just indicated, we think the court erred in denying relief under Mrs. Lehmann's cross-bill. We do not think Rothbarth ought to be permitted to shield himself behind the settlement of December, 1879. The circumstances under which it was effected, as well as its subsequent ratification, appeal strongly in her behalf. It is apparent she did not, at the time, understand what her rights were, for, as already shown, she had been practically excluded by him for years from all participation in the management and control of the estate, including her own as well as that of her children, and hence it was impossible for her to have any reliable information as to the condition of her affairs or her rights in the premises. Moreover, by his harsh and cruel treatment, his imperious bearing and conduct, resulting, as she claims, in serious sickness and despondency, she was evidently, at the time, in no condition to enter into a business engagement of such magnitude. In short, under all the circumstances, we regard the so-called settlement as a fraud upon her rights, and it should not,

therefore, be permitted to stand.   He has never accounted to her for the moneys she put into his hands, though often urged to do so.   This he must do.   Honesty and fair dealing require it.   If he has kept his accounts, as her trustee, by preserving proper vouchers for all disbursements, and charging himself with all moneys that went into his hands, as the law requires he should have done, it will impose no hardship on him; and if he has failed to do this, it is but right that he should suffer any inconvenience his neglect in this respect brings upon him.

The decree of the court below is reversed, and the cause remanded for further proceedings in conformity with the views here expressed.

*Decree reversed.*

Mr. JUSTICE CRAIG, dissenting.

Mr. JUSTICE SCOTT:  I am of opinion no freehold is involved in this case, and that the motion to dismiss should be allowed. For that reason I do not now wish to express any opinion as to the merits of the controversy.