WALTER S. DICKEY, Appellant, v. WILLIAM VOLKER ET AL., As University Trustees of William Rockhill Trust under Last Will of William Rockhill Nelson, IRVIN KIRKWOOD ET AL., THE KANSAS CITY STAR COMPANY and NORTH TODD GENTRY, Attorney-General. —11 S. W. (2d) 278.

Court en Banc, October 27, 1928.

238

*Miller, Winger & Reeder* and *Foristel, Mudd, Blair & Habenicht* for appellant; *Austin W. Scott* and *Leland Hazard* of counsel.

240

*Cyrus Crane, I. N. Watson, Samuel W. Sawyer, John H. Lathrop* and *George O. Pratt* for respondents.

GANTT, J.—William Rockhill Nelson, owner and publisher of the *Kansas City Star,* the *Kansas City Times* and the *Kansas City Weekly Star,* died April 3, 1915, leaving a will, in which, after certain devises and bequests, the residue of his property, including the newspapers, was left to his wife and daughter in trust, subject to life estates in them, to be invested and reinvested as provided in the will, and the net income therefrom, after the payment of certain bequests, to be paid to them. Upon their death it was provided that the property in trust should pass to trustees selected by a board consisting of the then presidents of the state universities of Missouri, Kansas and Oklahoma, to be known as University Trustees. It was further provided the University Trustees should manage, control, invest and reinvest, as stated in the will, the net income of the trust property in "works and reproductions of works of fine arts, such as paintings, engravings, sculpture, tapestries and rare books, the purpose being to procure in this manner works and reproductions of works of the fine arts which might contribute to the delectation and enjoyment of the public generally, but are not generally provided for by public fund." The wife and daughter continued the publication of the newspapers during their lifetime, retaining the services of the managing employees during said time. After the death of the wife and daughter, and on March 3, 1926, the presidents of said universities named the defendants, William Volker, J. C. Nichols and Herbert V. Jones, as University Trustees. Thereupon, the trust estate, including the newspaper properties, passed to the trustees for said charitable use. The University Trustees continued the publication of the newspapers, retaining the services of the managing employees. It was provided the University Trustees should sell the newspaper properties within two years after the death of the wife and daughter, and the proceeds should remain

in the trust fund. The managing employees were the defendants Irwin Kirkwood (now deceased), August F. Seested, Ralph E. Stout, deceased, George B. Longan, Henry J. Haskell, Earl McCollum and John T. Barrons. The Kansas City Star Company is a corporation, organized by these defendants to take title to the newspaper properties if purchased by them. The other defendant is the Attorney-General. Under the power granted to the trustees in the will, they advertised for bids for the newspaper properties and received, on or prior to July 9, 1926, eight bids, among them the bids of the plaintiff, Reed & Lunsford, and Kirkwood et al. The bid of Kirkwood et al. was accepted, and the title to the newspaper properties was transferred to the Kansas City Star Company.

The plaintiff laid the facts in connection with the sale of the properties before the Attorney-General with a request that he "pitch" this suit. The request was refused. Plaintiff "pitched" the suit, making the Attorney-General a party defendant. Other facts will be noted.

Plaintiff seeks to have the sale set aside on the ground of fraud, and, if set aside, that the court consider the bids and determine if either should be accepted; and, if so, that the court direct the trustees to accept the same; or, if the court should find that none of the bids should be accepted, that the court order a new sale of the properties under terms and conditions fixed by the court.

The Attorney-General demurred to the amended petition, for the reason the plaintiff is without legal capacity to institute the suit. The other defendants demurred and filed motions to dismiss, for the reasons the plaintiff is without legal capacity to sue and the petition does not state facts sufficient to constitute a cause of action.

The demurrers and motions were sustained, and, the plaintiff declining to plead further, judgment was entered for the defendants, and plaintiff appealed.

Counsel have briefed the whole of the law relating to charitable trusts. To reach the questions for solution, it may be taken as determined that the will created a charitable trust for the entire public; that the trustees did not have an arbitrary discretion; that a charitable trust once validly created is inviolate; that in England the chancellor had judicial and administrative powers; that in Missouri a court of equity exercises only judicial powers, and jurisdiction is only acquired by a suit regularly instituted by a proper party (State ex rel. v. Muench, 217 Mo. 124, 137, 117 S. W. 25; State ex rel. v. Rusk, 236 Mo. 201, 214, 139 S. W. 199); that the protection of charitable trusts has been, from the earliest time, a principal function of courts of equity; that the Statute of 43 Elizabeth did not impair the original jurisdiction of courts of equity over charitable trusts; that every action shall be prosecuted in the name of the real

party in interest; that no prerogative power exists in the United States, and the *cy pres* doctrine by the Crown's prerogative has no place in the courts of law and equity in this country; that the *cy pres* doctrine is judicially administered by the equity courts of Missouri; that suits may be instituted by the next of kin to the donor or testator to determine the validity of a charitable trust, or by trustees to enforce a trust.

I. Respondents contend the appellant is not a real party in interest, and the power to institute this suit is lodged solely with the Attorney-General. Appellant concedes the right of the Attorney-General to institute the suit, but denies the right is preclusive, and insists that he is a real party in interest and had the right to institute the suit. While it is alleged that he has a special interest in the sale by reason of the fact that he was a bidder, yet he is not suing to enforce his right as the best bidder, but he sues solely as a beneficiary of the trust.

Ordinarily a trust for the benefit of an indefinite number is void, for the reason there is no one to enforce it. In England charitable trusts came to be favored. The result was an exception to the general rule in favor of such trusts. The king was the guardian of such trusts, and enforced them by his attorney-general with the aid of the chancellor. In this country the people as guardian enforce them in the equity courts by their attorney-general. An individual member of the public has no vested interest in the property or funds of the trust. In common with other members he has an interest in the charitable use. He has no right of action for the mismanagement or misuse of the fund. Any action on this account must be taken by the attorney-general as the representative of the public. However, those with a special interest may enforce the trust, or a localized or grouped charity may be enforced by a class suit. In such suits it is proper and often necessary to make the attorney-general a party defendant.

The rule and the exceptions have been universally sustained, as shown by the following standard texts and decisions of this court and the courts of other jurisdictions.

"If, after the charity is established and is in process of administration, there is an abuse of the trust or misemployment of the funds, and there are no individuals having the right to come into court and maintain a bill, the attorney-general, representing the sovereign power and the general public, may bring the subject before the court by bill or information, and obtain perfect redress for all abuses. But where a gift is not a public charity, but is to a school that is not free and open to the general public, the attorney-general

cannot maintain an information or bill. So if there is a gift or dedication of land for a church or meeting-house, to be owned by the church, parish, society or by pew-holders who have vested rights and can sue, the attorney-general cannot sue in his official capacity, unless the gift is so public and indefinite that no individuals or corporations have the right to come into court for redress." [2 Perry on Trusts (6 Ed.) sec. 732.]

"Where the trust is for a public charity, there being no certain persons who are entitled to it so as to be able to sue in their own names as *cestuis que trustent,* a suit for the purpose of having the charity duly administered must be brought in the name of the state or the attorney-general, and it seems that in all cases the attorney-general may maintain the suit with or without a relator." [22 Ency. Pleading & Practice, 205.]

"A charitable trust is of public concern and the attorney-general is the protector of the interests of the public, or, what is the same thing, of the indefinite and fluctuating body of persons who are the *cestui que trust.* . . . In fact, the attorney-general is the only one who can properly invoke the superintending power of the courts over the administration of such trusts." [2 R. C. L., Title, Attorney-General, sec. 12, p. 923.]

"**Attorney General.** If property devoted to public charity is endangered or faultily administered, the attorney-general, as such, may institute the proper proceedings to protect the estate. This is settled law in this country as in England. The charities which the attorney-general can sue to enforce or conserve must be charities of a character so public as to interest 'the entire public.' " [11 C. J. 366, 367, and cases cited.]

"In suits for the enforcement of a public trust or charity, the attorney-general is the proper suitor, and he may file an information either of his own motion or on the relation of any party concerned." [11 C. J. 368.]

Appellant argues the texts do not assert a preclusive right in the Attorney-General to sue. It is stated if no individuals are entitled to sue, the Attorney-General may sue. If other persons were entitled to sue, it would have been so stated.

The case of Lackland v. Walker, Attorney-General, 151 Mo. 210, l. c. 242, 52 S. W. 414, was a suit in equity for the application of the *cy pres* doctrine. In determining the necessary parties to the suit, we said:

"This part of the will of Henry Shaw operated as an immediate devise of the property affected thereby to the trustees therein named, and his heirs at law at no time and under no circumstances can acquire or successfully assert any interest therein. Hence these heirs

were not necessary parties to this suit. . . . The public is the beneficiary of the trust, and the Attorney-General, as its representative, was the only real party in interest or required to be made a defendant. . . .''

In State ex rel. v. Rusk, 236 Mo. 201, l. c. 215, 139 S. W. 199, with reference to the power of a chancellor over charitable trusts, we said: ''He may move only at the instance of the Attorney-General who moves on behalf of the people, or at the instance of some other proper party.'' (A proper party is a trustee, any member of a class, or anyone with a special interest).

In the case of Women's Christian Association v. Kansas City et al.; Campbell et al., 147 Mo. 103, l. c. 128, 48 S. W. 960, the plaintiff was a corporation, organized for charitable purposes. By its petition it sought the application of the *cy pres* doctrine. The Attorney-General was made a party defendant, and by his answer joined in asking the same relief as prayed for in the petition. His answer was treated as the petition, and in passing on the right of plaintiff to institute the suit, we said:

''As plaintiff in its own right, unaided by the answer of the Attorney-General, had no standing in the court to have alone justified the court's assertion of authority in the premises, and as its petition was treated as a mere formal offer of acceptance on its part of the duties proposed to be assumed, and that was by the decree put upon it in obedience thereto, and as the relief granted was properly in response to the prayer of the Attorney-General's answer, we think the court was not warranted in imposing upon the proceeds of the estate to be sold, the burden of the expense of the plaintiff's attorneys in and about the preparation of its petition or the trial of the cause in conjunction with the Attorney-General.''

To the same effect: Lanning v. Commissioners, 63 N. J. Eq. 1.

Chambers v. City of St. Louis, 29 Mo. 543, was a suit by the heirs to determine the validity of a charitable trust, and there we quoted the following (1. c. 592):

''Whether the trustees are private individuals or a corporation, the administration properly belongs to such trustees; and the king, as *parens patriae*, has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any misuse or abuse of the funds by the trustees, the court of chancery will interpose at the instance of the Attorney-General, or the parties in interest, to correct such misuse or abuse of the funds.'' [Story, sec. 1191.] Of course this means parties with a special interest.

In People v. Cogswell, 113 Cal. 129, l. c. 136, 45 Pac. 270, it was said:

"This action is based upon averments of a public trust. It is brought to remedy abuses in the management of this trust. It is not only the right, but the duty, of the Attorney-General to prosecute such an action. The State, as *parens patriae*, superintends the management of all public charities or trusts, and, in these matters, acts through her Attorney-General. Generally speaking, such an action will not be entertained at all unless the Attorney-General is a party to it. Such was the rule at common law, and it has not been changed in this State. Even in those states, such as Massachusetts, where, by special statute, the Attorney-General is instructed to prosecute such actions, it is declared that the statute does not narrow or diminish in this regard the common-law powers incident to the office. [Parker v. May, 5 Cush. 336.]

"The principle and rule are thus succinctly stated in Attorney-General v. Compton, 1 Younge & C. C. 417: 'Where property affected by a trust for public purposes is in the hands of those who hold it devoted to that trust, it is the privilege of the public that the crown should be entitled to intervene by its officers for the purpose of asserting, on behalf of the public generally, the public interest and the public right, which, probably, no individual could be found (willing) effectually to assert, *even if the interest were such as to allow it.*'" (Italics ours.)

In Association for the Relief of Females v. Beckman, 21 Barb. (N. Y.) 565, the plaintiff sought to compel the executors of the will of William Barthrop to execute the provisions of the will as trustees and to dispose of the estate according to the charitable intent of the testator. In ruling on the right of plaintiff to maintain the suit, it was said, at pages 568, 569:

"The object of the suit is to establish a trust for charitable uses and to have it executed. The theory of the complaint is, that the testator, by his will, devoted the bulk of his estate to charity, and that the trustees appointed by him for that purpose, and those to whom the administration of the estate has been committed, have failed to carry his intentions into effect. . . . Where the trust is for a public charity, there being no certain persons who are entitled to it, so as to be able to sue in their own names as *cestuis que trust*, a suit for the purpose of having the charity duly administered, must be brought in the name of the attorney-general. In such a case that officer, as representative of the public, would occupy the relation of *cestui que trust* to trustees."

In Stearns v. Newport Hospital, 27 R. I. 309, l. c. 315, 316, 62 Atl. 132, in ruling on the right of one of the plaintiffs to maintain the suit, it was said:

"As a citizen and taxpayer he has no standing in this cause. The trust was not intended to benefit him by diminishing ɲis private charities or public burdens. Incidentally it may have that result, but the intention of the founder was to increase the comfort of the poor and sick, not to substitute his aid for the benefits which they could already claim under the law. . . . The trust is a public one, and the attorney-general is the proper person to represent ·he public in any judicial inquiry into the conduct of the trustees in administering it. . . . 'This duty of maintaining the rights of the public is vested in the Commonwealth, and it is exercised here, as in England, by the Attorney-General.' "

In the Dartmouth College case, 4 Wheat. 518, l. c. 641, 642, 643, it was said:

"The students are· fluctuating, and no individual among our youth has a vested interest in the institution, which can be asserted in a court of justice. . . .

"The corporation is a trustee for them also. Their potential rights, which, taken distributively, are imperceptible, amount collectively to a most important interest. These are, in the aggregate, to be exercised, asserted and protected, by the corporation. They were as completely out of the donors, at the instant of their being invested in the corporation, and as incapable of being asserted by the students, as at present."

To the same effect: Attorney v. Miner, 2 Lans. (N. Y.) 396; Attorney-General v. Soule, 28 Mich. 153, l. c. 155; Attorney-General v. Newberry Library, 150 Ill. 229, 236, 37 N. E. 236; Barker v. Hauberg, 325 Ill. 538, l. c. 551; Attorney-General v. Agricultural College, 85 Ill. 516; Green v. Blackwell (N. J.), 35 Atl. 375; McKenzie v. Trustees, 67 N. J. Eq. 652, 61 Atl. 1027, 3 L. R. A. (N. S.) 227; Ewell v. Sneed, 136 Tenn. 602; Owens v. Missionary Society, 14 N. Y. 380, 67 Am. Dec. 160; Gibson v. Frye Institute, 137 Tenn. 454, l. c. 463; Schell v. Leander Clark College, 10 Fed. (2d) 542; Chambers v. Baptist Educational Society, 1 B. Monroe (Ky.) 215; Sanderson v. White, 18 Pick. (Mass.) 328; Jackson v. Phillips, 14 Allen (Mass.) 539, l. c. 576, 577; Burbank v. Burbank, 152 Mass. 254; Dillaway v. Burton, 153 N. E. 13 (Mass.); Attorney-General v. Bedard, 218 Mass. 378, 385, 105 N. E. 993; Crawford v. Nies, 224 Mass. 474; Strong v. Doty, 32 Wis. 381; Nelson v. Church, 74 Ore. 162, 145 Pac. 37; Attorney-General v. Parker, 126 Mass. 216, 221; Trustees v. Visitors, 253 Mass. 256, 148 N. E. 900; Attorney-General v. Armstrong, 231 Mass. 196, 203, 120 N. E. 678; Krauthoff v. Attorney-General, 240 Mass. 88, l. c. 92; Baptist Church v. Presbyterian Church, 57 Ky. 635, l. c. 641; Lang v. Purves, 8 Jurists (N. S.) 523 (1862); In re St. Michael's Church, 76 N. J. Eq. 524; Clark

v. Oliver, 91 Va. 421; Wellbeloved v. Jones, 1 Sim. & Stu. 40 (1822).

Appellant contends the Massachusetts cases rest on a statute relating to the duties of the Attorney-General, as follows:

"He shall enforce the due application of funds given or appropriated to public charities within the commonwealth, prevent breaches of trust in the administration thereof and, if necessary, prosecute corporations which fail to make to the general court the returns required by law. [Sec. 6, Chap. 7, R. S. 1902.]"

That part of the statute relating to the enforcement of trusts is declaratory of the common law and is not exclusive. Members of a class or persons having a special interest are not prohibited from instituting such suits.

The preclusive right of the Attorney-General of Massachusetts to institute suits relating to charitable trusts for the use of the entire public was fixed by the courts of Massachusetts prior to the enactment of the statute. [Sanderson v. White, 35 Mass. 325; Parker v. May, 5 Cush. (Mass.) 336.]

In the Parker case it was said (1. c. 337, 338):

"The authorities cited, I am satisfied, show that such a suit by the public prosecutor, in the name of the commonwealth, for establishing and sustaining charitable trusts, is, in truth as well as in form, a suit to protect public interests; and that it must be prosecuted with the sanction of the public prosecutor, whose duty it is to see that the public interests sustain no detriment, and to proceed in the prosecution or stay proceedings, as a just regard to these interests may require. It follows, therefore, that this proceeding is not to be considered as the suit of the relators, nor can the relators, of their own motion, or in their own names, take any step in the cause, or be heard as parties. . . .

"The power to institute and prosecute a suit of this nature, in order to establish and carry into effect an important branch of the public interest, is understood to be a common-law power, incident to the office of the Attorney-General or public prosecutor for the government. Since the passage of the act (St. 1843, c. 99), abolishing the office of Attorney-General, this beneficial power would fail, and the rights of the community dependent upon it would be defeated, for want of remedy, if this power did not survive in the several local public prosecutors; a conclusion, to which the court ought not to come unless it is a necessary one."

In State ex rel. Barrett v. Boeckler Lumber Co., 302 Mo. 187, 1. c. 205, 206, 257 S. W. 453, we said:

"It is generally held in this country that the office of Attorney-General is clothed, in addition to the duties expressly defined by statute, with all the powers pertaining thereto under the common

law. 'A grant by statute of the same or other powers does not operate to deprive him of those belonging to the office under the common law, unless the statute, either expressly or by reasonable intendment, forbids the exercise of powers not thus expressly conferred.' [6 C. J. 810.] This view has been tacitly accepted, and acted upon, in this State for many years."

Appellant cites the following Missouri cases:

State ex rel. Pittman v. Adams, 44 Mo. 570, 582, was in *quo warranto* to determine the validity of an act of the Legislature impairing the charter of a college as to the selection of curators. We said: "Who, then, are the real parties in interest? Clearly the beneficiaries of the charity. Their right becomes, as it were, vested; they are, as it were, equitable owners of the fund."

The statement was made *arguendo* and had no reference to the capacity of anyone to maintain a suit. We further said:

"Light may be thrown upon this subject by considering the nature of the grant, the relation held to it by the curators, and who are the real parties in interest. First, the grant is absolute, subject only to the conditions imposed. Subsequent contributors are subject to the same conditions, and the heaviest have no such interest as will entitle them to come into court in their own name, but, like others, they must be represented by the Attorney-General."

Following this statement, we cited Kemper v. Trustees of Lane Seminary, 17 Ohio, 293, where it was said, at page 327:

"In support of the bill, and in answer to these grounds of objection, it is argued that there is a direct privity of estate and of contract between the grantor and grantee, in the deed, and so long as both parties are living, either party may enforce its execution. If this be so, it must be because there remains some interest in the grantor, as *cestui que trust*, or beneficiary, or that he stands in the relation of founder, retaining an interest. We can see no such interest. The mere fact of being a Presbyterian of the Old School is insufficient. No one would pretend that any member of that branch of the Presbyterian Church could maintain the bill. But if that relationship would in any case be sufficient, such suit would have to be presented by all persons belonging to the society, or by someone suing for himself in behalf of all. This bill proceeds on no such ground, and, as said before, mere membership of that branch of the Presbyterian Church would not be sufficient. This is not like the case of one who, being a member of the congregation, sues in behalf of himself and other members of the same congregation to compel the proper administration of a common property, in which each and every member has a specific but joint interest, for here there is no interest in the estate."

Academy of Visitation v. Clemens, 50 Mo. 167, was a suit by the trustee against the heirs for the application of the *cy pres* doctrine. Mott v. Morris, 249 Mo. 137, 155 S. W. 434, was a suit by the trustees of the churches against the heir to determine title and for authority to sell the land and divert the trust fund to other purposes. Board of Regents v. Painter, 102 Mo. 464, 14 S. W. 938, was a suit in ejectment by the grantee of the trustee. Lilly v. Tobbein, 103 Mo. 477, 15 S. W. 618, was a class suit by the members of a church to establish a will creating a charitable trust. These cases are cited for the reason the Attorney-General was not made a party defendant. In each of them the court sustained the trust. No point was made on the absence of the Attorney-General. If the question had been raised, the court should have ordered him made a party defendant.

In re Rahn's Estate, 291 S. W. 120, was a suit by the German Consul of St. Louis, who was designated in the will to receive a trust fund for the use of the German Red Cross Society. We sustained the trust and the right of the German Consul to the fund. The German Red Cross Society did not operate in Missouri, and the Attorney-General was not a necessary party to the suit.

Appellant also cites: Ludlam v. Higbee, 11 N. J. Eq. 342; Dominy v. Stanley, 133 S. E. 245 (Ga.) 1926; Bliss v. Linden Cemetery Association, 81 N. J. Eq. 394; Milligen v. Mitchell, 3 Myl. & Cr. 72 (1837); Nash v. Morley, 5 Beav. 177 (1842). These cases do not involve the right to maintain a suit. The plaintiffs had a special interest.

The cases of Garrison v. Little, 75 Ill. App. 402; Tate v. Woodyard, 140 S. W. 1044 (Ky.) 1911; Von Hoven v. Church, 108 La. 274; and Clements v. Hyde, 50 Vt. 716, are also cited by appellant. The Garrison case is a suit by a trustee; the Von Hoven case is a class suit; the Tate case is a suit by a donor; and the Clement case is a suit by the executor against the trustees to determine the validity of a trust. These cases did not rule on the right of a member of the general public to sue, and the statements made to the effect that any member of the public could maintain a suit were *obiter dicta* and in conflict with all the authorities. In the Clement case it was stated that "probably anyone as *amicus curiae*" could compel the enforcement of a trust by a proper information, citing Sir Francis Moore in 1 Am. Law Reg. (N. S.) 397, 398. Sir Francis was giving a "reading" on the additional jurisdiction or remedy provided by the Statute 43 Elizabeth. The remedy provided for commissioners to aid the chancellor in the enforcement of charitable trusts. The commissioners could enter a decree, but could not enforce it. The decree could be enforced only by the chancellor. The Attorney-General did not appear before the commissioners, and there were

"no parties properly so called." [Gray, Rule against Perpetuities (3 Ed.) 533.] Obviously, the procedure before the commissioners and before the chancellor on appeal from the commissioners is not authority in this country.

These authorities directed the appellant to the Attorney-General, and they are responsible for the allegations in the petition that appellant is a member of a class, that he has a special interest in the sale of the property as a bidder, and that he made the Attorney-General a party defendant as the representative of the beneficiaries. There is no class, for the reason the testator did not create a local or group charity. Even if the entire public could be a class, he has brought no class suit, for he does not sue for himself and other members. This is necessary that the court may determine the adequacy of the representation. [21 C. J. 287.] He does not allege a special interest in the charity. His interest as a bidder is hostile, and "he cannot stand as a representative of other beneficiaries." [21 C. J. 286.] As an unsuccessful bidder he is entitled to no relief. [State ex rel. Doniphan State Bank v. Harris, 176 S. W. 9; Colorado Pav. Co. v. Murphy, 78 Fed. 28; Coquard v. School Dist., 46 Mo. App. 6, 26 R. C. L. 1291.] The use being for the entire public, his interest is so trifling he should not be permitted to maintain the suit. [Smith v. Williams, 116 Mass. 510; 21 C. J. 285.] The fact that he made the Attorney-General a party defendant as the representative of the beneficiaries is an admission that he represents no one but himself. He argues that by the presence of the Attorney-General all of the necessary parties are in court, but the Attorney-General is not willingly in court. If the beneficiaries can be forced into court in this manner, then the Attorney-General does not have the preclusive right to institute the suit. If he has that right, and we so hold, we are without authority to compel him as a party defendant to consent to the prosecution of the suit. Of course, if he did consent, as was done in the case of Women's Christian Association v. Kansas City, 147 Mo. 103, 48 S. W. 960, there would be a different question for solution. If the appellant is without authority to institute the suit, the unwilling presence of the Attorney-General as a party defendant does not confer that authority upon him. [Tyree v. Bingham, 100 Mo. 451, 13 S. W. 952.]

We come now to consider the real contention of appellant. Attention is directed to early chancery proceedings in England, as follows: (1) "Calendars of the Proceedings in Chancery in the Reign of Queen Elizabeth;" (2) "Reports by the English Commissioners of Charities;" (3) "Index of Chancery Proceedings. (Series 1)." These records show the cases were pending and some of them decided prior to the fourth year of the reign of James the First.

Appellant contends that by Section 7048, Revised Statutes 1919, these early chancery proceedings announce the common law rule on the question in Missouri. We do not think so. "They are only evidence of law." A standard text states the rule, as follows:

"The judicial decisions of the courts of England are not deemed to be a part of the common law, but merely expositions thereof. Hence it is that the courts of this country, in order to ascertain the principles and rules of the common law, may look to the decisions of other states of the Union as well as to those of the English courts; and, further, that the courts of this country are not required to adhere to the decisions of the English common law courts rendered prior to the Revolution, or subsequently. This does not mean, however, that such decisions and other authorities may not properly be considered as indicative of. what the common law was in any time past or what it may be at present." [5 R. C. L. 818, 819.]

In Williams v. Miles, 68 Neb. 463, 4 Ann. C. 306, it is said (l. c. 471):

"The term 'common law of England,' as used in the statute, refers to that general system of law which prevails in England, and in most of the United States by derivation from England, as distinguished from the Roman or Civil Law system, which was in force in this territory prior to the Louisiana Purchase. Hence the statute does not require adherence to the decisions of the English common-law courts prior to the Revolution, in case this court considers subsequent decisions, either in England or America, better expositions of the general principles of that system."

In Buchanan v. Kennard, 234 Mo. 117, l. c. 132, 136 S. W. 415, referring to the Statute 43 Elizabeth and the English common law preceding it, we said: "That statute, together with the common law of England upon the same subject, was made a part of the law of this State, and with the decisions of this court, now constitute the law upon public charities by which we must be governed in the determination of this case."

To the same effect: Musser v. Musser, 281 Mo. 649, l. c. 659, 660, 221 S. W. 46.

Appellant cites the case of Philadelphia Baptist Association v Hart's Executors, 4 Wheat. (U. S.) 1. In presenting this case the early cases in which the chancellor enforced charitable trusts were not called to the attention of the court, and Chief Justice MARSHALL ruled that the origin of the validity of charitable trusts was the Statute 43 Elizabeth. On the attention of the court being called to the early cases, he was overruled in Vidal v. Philadelphia, 2 How. (U. S.) 127, on this feature of the case. From this it is argued that the Supreme Court of the United States having been in error as

to the origin of the validity of charitable trusts, it follows, on the authority of the same cases, that all the courts may be in error in holding that the Attorney-General has the preclusive right to institute suits for the enforcement of charitable trusts for the use of the entire public. Undoubtedly the early cases show the chancellor enforced charitable trusts prior to the statute. However, we do not think these cases show or even tend to show that appellant had the right to institute this suit. The records of these cases are meager. Many of the copies presented are extracts from reports of commissioners and from indices of proceedings in chancery. The disposition of many of the cases is not recorded, and the records show the charities to be local and group charities. In some of the cases the plaintiff had a special interest. Professor Dwight, after a study of these cases, in 1 American Law Register (N. S.) 337, 338, concluded, as follows:

"The great result derived from all these cases is, that a charitable use could be given, after the Statute of Uses, to a definite person, for an indefinite body of persons residing within a given locality. Thus, in several cases, one or more of the inhabitants of a parish filed a bill against feofees, usually to establish a trust to real estate. The bill was usually brought by a single person in behalf of himself and the co-inhabitants of the parish. . . .

"Without accumulating authorities from this source, enough have been cited to show the judicial recognition of the existence of charitable trusts where the objects were, though indefinite, embraced within some circumscribed territorial division, or consisted of an unincorporated body."

In Attorney-General v. Ruper, 2 Peere Williams, 125, it was said:

"His Honor took notice, that money or charity given for repairing a church, is one of the charities mentioned, preserved, and established by the Stat. 43 Eliz. c. 4, that as on the one hand the parson of the church is a corporation for the taking of land for the use and benefit of the church, and not capable of taking goods, or any personalty on that behalf; so on the contrary, the church-wardens are a corporation to take money, or goods, or other personal things for the use of the church, but are not enabled to take lands.

"That goods given or bought for the use of the church are all *bona ecclesiae*, for the taking whereof the church-wardens may bring trespass. F. N. B. 91 K., and may bring trespass for the taking of these goods, as well in the time of their predecessor as in their own time."

An examination of the 101 cases shows all of the charities to be local. They are for purposes as follows: To be applied to the marrying of poor maids, for the benefit of the pastors, churches, schools, colleges, teachers of colleges, the poor, apprentices, and for the repair of highways, bridges and harbors.

It will be noted that at this time the churches were burdened in some measure with the maintenance of the schools and the care of the poor, and the inhabitants of the town or parish were burdened with the maintenance of the schools, churches, highways, bridges and harbors. This burden gave the inhabitants a special interest in the charity.

Appellant argues that charities for the repair of highways, bridges and harbors are charitable trusts for the benefit of the public at large, for the reason travelers from afar may use the highways and bridges, and sailors from the seven seas may find refuge in the harbors. This is true, but the burden of repairing the highways, bridges and harbors is upon the inhabitants of the town or parish.

If these early cases were heard on the administrative side of the court, the decisions would be no authority in this country. If they were heard on the judicial side of the court, they are not authority on the question, for the reason the charities are local, or the beneficiaries are grouped, or the plaintiff had a special interest.

The charity was located in Kansas City. From this it is argued that appellant had a special interest in the fund, for the reason he would have ready access to the charity. The testator provided for no degrees of interest on this account. If he had so provided, there is no allegation claiming a special interest on this account. Appellant has the same interest in the fund as the other members of the public. If he can with such an interest maintain this suit, then there is some one to enforce the trust for the benefit of an indefinite number of persons, and the exception to the rule is not needed to save the trust. Appellant has no property right in the fund, but only the right to view, in common with other members of the public, such works of art as the trustees may purchase and exhibit. Having no vested interest, it cannot concern him who has the right to bring the suit.

II. It is contended the appellant is not afforded protection under the "distribution of powers" article of the State Constitution, "the due process" sections of the State and Federal constitutions, and "the impairment of the obligation of contracts" section of the Federal Constitution. By the reply brief we understand the last contention to be abandoned. There is no infringement of judicial power by the executive department. Obviously, the refusal of the Attorney-General to bring the suit was not an usurpation of judicial power. He is in court in response to process, issued at the instance of the appellant. As an unwilling party he challenged the right of appellant to maintain the suit. In doing so he usurped no judicial power. On the con-

258

trary, he submitted himself to the judgment of such power. The judgment of the Attorney-General as the real party in interest on the advisability of bringing the suit is not an exercise of judicial power. If appellant has no property right in the trust fund, and we so rule, he is denied no constitutional protection by the courts adjudging the Attorney-General, as the representative of the public, to be the real party in interest, and, as such, clothed with the preclusive power to institute the suit. Having no property right in the trust fund, it cannot be held that appellant has been denied the due process protection afforded by the Constitutions.

On this question appellant cites cases holding the right to use one's property is a property right within the meaning of the Constitution, and to cases holding the 14th Amendment covers all instrumentalities by which the State acts, such as officers who deprive another of any right under the Constitution. These cases are not in point.

III.  Even if the appellant had the capacity to sue, does the petition state a cause of action?

The petition is an effort to charge fraud, and the rule is stated as follows:

"General averments of fraud or that acts were fraudulently committed are insufficient; the specific facts and circumstances constituting the fraud must be stated, and the facts so stated must be sufficient in themselves to show that the conduct complained of was fraudulent." [21 C. J. 396.]

"An exceptionally high degree of certainty in the allegation of the bill is required in those cases where the cause of action is based on fraud. . . .

"Furthermore, it is settled that general averments of fraud are wholly inadequate and insufficient. . . .

"In making allegations of fraud, good pleading requires that the plaintiff should state specifically the inculpatory facts in order that they may carry their own conviction of fraud and in order that the wrong-doing may thereby be made more clearly to appear." [10 R. C. L., Equity, sec. 171, p. 415.]

At this time we should note the rule of conduct provided for the trustees in the sale of the property, which is found in the following clause of the will:

"If at the time of the death of my wife and daughter they are as trustees publishing any newspaper or newspapers the same, with all printing presses and appurtenances used in connection therewith, shall be by said university trustees sold at the best price and on the best terms obtainable as soon as such sale can be made without sacri-

fice and not later than two years after the death of my wife and daughter.''

(a) It is alleged Kirkwood et al. were fiduciaries and disqualified to purchase. They were fiduciaries as to the management of the newspapers and the operation of the plant. By the will the trustees only were named as agents to sell, and it is not alleged that Kirkwood et al. were employed by the trustees to assist in selling the properties. Realizing the necessity of connecting Kirkwood et al. with the sale of the properties, it is alleged that as the managers and operators it was their duty to assist in obtaining the best price and the best terms for the properties. We do not think so. Their duties were limited to management and operation. The agency does not fall within the rule applicable to guardians and wards, trustees and *cestui que trust*, agents to sell, and similar relationships, nor does the mere agency for one purpose disqualify the agent from dealing with his principal outside of the subject of the agency. The rule is stated as follows:

''But the fact that the agent was employed by the principal in one matter will not incapacitate him from dealing with the principal in another matter as to which he was not so employed and trusted.'' [2 C. J. 706, sec. 363.]

In Douglass v. Lougee, 123 N. W. 967, it was said:

''If the agency is to sell, and the agent is himself the buyer, there is no doubt about the rule being as contended for appellant. But if the agency is for another purpose, and the purchase is quite outside any of the duties of the agency, then another rule applies.''

To the same effect: Brown v. Brown, 154 Ill. 35; Wilson v. White, 194 N. W. 593 (Mich.); Curlett v. Newman, 30 W. Va. 182, 3 S. E. 578; Spalding v. Mattingly, 89 Ky. 83, 1 S. W. 488.

Appellant avails himself of the statement of Lord St. Leonard in his work on Vendors and Purchasers, as follows: ''Any persons who, being employed or concerned in the affairs of another, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restrictions which will be shortly mentioned.'' If he means that an agent cannot avail himself of knowledge acquired in that capacity to the injury of his principal, then we agree to it. If he means that a mere agency to manage and operate disqualifies the agent to purchase, then we do not agree to it.

Appellant also avails himself of the principle stated in 1 Mechem on Agency (2d) sec. 1202, as follows: ''Sub-agents, clerks and assistants are fiduciaries, and, as such, incapable of purchasing property of the principal.'' The preceding sections show the author had reference to sub-agents, clerks and assistants to an agent to sell.

260

Appellant cites the following cases: York Building Co. v. Mc-Kenzie, 3 Paton (4 S. C. App. 378); Gardner v. Ogden, 22 N. Y. 327, 78 Am. Dec. 192; Grumley v. Webb, 44 Mo. 444, 1. c. 451; Michoud v. Girod, 4 How. 503; Dibert v. D'Arcy, 248 Mo. 618, l. c. 658; Davenport v. Casey, 222 S. W. 791, l. c. 794; Meek v. Hurst, 223 Mo. 1. c. 698, 122 S. W. 1024; 1 Perry on Trusts (6 Ed.) sec. 195; Iroquois Iron Co. v. Kruse, 241 Fed. 433, 1. c. 441; 1 Mechem on Agency (2 Ed.) sec. 1202; Ryan v. Ryan, 174 Mo. 279, 1. c. 286; Cornet v. Cornet, 248 Mo. 1. c. 235; J. H. Lane & Co. v. Maple Cotton Mill, 232 Fed. 421, 1. c. 423, 424; Trice v. Comstock, 121 Fed. 620, 1. c. 622; Conn. Mutual Life Ins. Co. v. Smith, 117 Mo. 261, l. c. 295; Magruder v. Drury, 235 U. S. 106, 1. c. 119; Buckles v. Lafferty's Legatees, 2 Robinson (Va.) 292; In re Frazin & Oppenheim, 181 Fed. 307, 1. c. 309; Ex parte Lacy, 6 Ves. 1. c. 620; Ex parte Bennett, 10 Ves. 381; Terwilliger v. Brown, 44 N. Y. 237, 1. c. 240, 241; Storer v. Lane, 20 S. W. 852, 1 Tex. Civ. App. 250; Dyer v. Shurtleff, 112 Mass. 165, l. c. 167, 169; Lehmann v. Rothbarth, 111 Ill. 185, l. c. 195.

These cases concern agencies to sell or similar relationships, and the rule announced is not applicable to an agency to manage and operate.

Of course, if Kirkwood et al. had been called upon by the trustees for information and they had concealed property or misled the trustees as to its value, and thereafter purchased the property, then they would be guilty of fraud. They are not charged with any such conduct, and the mere agency to manage and operate does not disqualify them to purchase.

(b) It is charged that Kirkwood et al. and the trustees entered into a conspiracy to bring about the sale of the property to Kirkwood et al. The effort to sustain the charge is set forth in the following allegations:

1. That Kirkwood et al., immediately following their appointment by the trustees, announced in the *Editor and Publisher*, a publication of New York City, circulating among newspaper officials, that they were in the market to buy the properties; that the trustees had not indicated the method of sale or when they would begin the collection of art works, and that it is believed they will endeavor to find purchasers who will continue the policies of the newspapers; and that Kirkwood et al. used the columns of the *Star* and *Times* for the purpose of spreading propaganda to the effect they were the logical parties to whom the properties should be sold, and that said publications were made for the purpose of discouraging and preventing others from bidding on the

properties, and leading others to believe they would be favored by the trustees.

Whatever may have been the intention of Kirkwood et al., no fact is alleged tending to show the article in the *Editor and Publisher* discouraged and prevented bidding. The allegation that the article was a part of a system of propaganda designed for the purpose of discouraging bidders is a conclusion without any fact to support it, and it is not alleged the trustees were parties to or had knowledge of the publication.

Neither are facts alleged to support the conclusion of appellant that the columns of the *Star* and *Times* were used to discourage bidders. There is no allegation of fact tending to show the contents of the articles or when they were published.

2. Appellant extends himself by alleging throughout the petition that Kirkwood et al. refused to furnish him information regarding the properties, and refused to permit his agents to inspect the equipment; that the purpose was to prevent appellant from acquiring a knowledge of the properties equal to the knowledge of Kirkwood et al. The duties of Kirkwood et al. were limited to management and operation. They were without authority to furnish information for any purpose unless so directed by the trustees. If they had done so, they could have been justly charged with misconduct.

3. That the trustees refused to furnish appellant adequate information as to the value of the properties. There is no allegation tending to show just what information was furnished as to the quantity and value of the properties. It is alleged that on May 14, 1926, the trustees gave notice in the newspapers of Kansas City that the inventory and appraisal of the newspaper properties had been completed and they were in a position to furnish information to bona-fide prospective purchasers. We should not assume the trustees withheld information, which, if furnished, would aid in obtaining for the properties the best price.

Finally, on June 30, 1926, appellant submitted to the trustees a request, in writing, setting forth a lengthy detail of information wanted for use in making his bid. It is alleged the refusal to furnish such information prevented him from making an intelligent, and, *possibly*, a higher bid, and tended to chill bidding. No fact is alleged tending to show the refusal chilled bidding, nor is it alleged the information would have increased the amount of any bid.

It will be noted that notice was given by the trustees on May 14, 1926, that they were ready to furnish information. The last

day to receive bids was July 9, 1926. It would have taken accountants weeks to have compiled the information, and appellant must have known the trustees could not comply with the request.

4. That appellant on several occasions advised the trustees they should have an inventory and appraisal made by well-known experts, and a copy furnished to bidders that they might know the true value of the properties. It is not alleged the trustees sought the advice of appellant on this or other matters. They were not directed to do so by the testator, and the sale should not be set aside for this reason.

5. Appellant exerted himself to learn the value of the properties. The trustees were not directed to sell for value, but for the best price obtainable. Often the best price is obtained by not disclosing the value.

It is alleged the trustees stated they would not furnish the complete information demanded by appellant and would not give to his agents, auditors and appraisers access to the books, records and confidential files of the newspapers, for the reason he was a competitor. We may assume he was a competitor, for it is not denied in the petition. It is clear the trustees could limit the information to be furnished to prospective bidders. For this reason they could, without being justly charged with misconduct, refuse the request of appellant; therefore, the reason given is not important. The trustees had not only the burden of selling the properties but that of protecting the properties pending the sale. We think the trustees exercise sound discretion in refusing to make a full disclosure of the business affairs of the newspapers.

6. It is alleged the trustees refused to furnish a statement of the earnings of the properties from February 26, 1926, to July 9, 1926, and for a period of ten years just prior to the day of sale. This information might have tended to reduce the amounts of the bids and discourage bidding. The refusal was within the discretion of the trustees.

7. That Kirkwood et al. by reason of their position had an advantage over other bidders. The testator did not direct the trustees to consider the positions of the bidders with reference to the property, but he directed them to obtain the best price for the property. If Kirkwood et al. had resigned immediately after the death of Mrs. Kirkwood and had then bid for the property, much of the contents of the petition would not have been available to appellant; yet Kirkwood et al. by reason of their

long service would have been in the same position with reference to the property as they were at the time they made their bid. If they had resigned, with their knowledge of the properties, it might have tended to discourage bidding; whereas their continuation in the service and their announcing at the beginning that they were in the market for the properties most likely tended to impress the idea upon others that it was desirable property.

8. That before giving out information to bidders regarding the properties, the trustees referred all inquiries from bidders to Kirkwood et al. It is not alleged Kirkwood et al. furnished to the trustees incorrect and misleading information as to the value of the properties, and it would be expected the trustees would seek detailed information of the properties from Kirkwood et al. In fact, there was no other source of information.

9. That sufficient notice of the sale was not given, and the form of bid was not furnished to the bidders in time. The trustees made announcement in the newspapers of Kansas City, as follows:

"As Trustees of the William Rockhill Nelson Trust we have completed an inventory and appraisement of the plant and appurtenances of the Kansas City *Star* and *Times,* and are now in a position personally to confer with and supply information to bona-fide prospective purchasers, with a view to the sale of the properties.

### "Trustees Notice.

"The university trustees of the William Rockhill Nelson trust have sent the following letter to prospective purchasers of *the Kansas City Star*:

" 'Since the announcement on May 14 of our readiness to furnish information to prospective purchasers of *The Kansas City Star,* we have supplied information to a considerable number, several of whom have announced their readiness and desire to submit offers.

" 'It is our purpose to avoid undue delay by having offers in hand before the vacation period arrives and, therefore, request that offers be submitted for our consideration by June 30, 1926.'

"Trustees Notice, June 25, 1926:

"Upon the request of one of those considering the purchase of *The Kansas City Star* newspaper properties for additional time, the trustees hereby postpone the date on which they request that offers be submitted for their consideration from June 30, 1926, heretofore set, to July 9, 1926."

On request of one of the bidders, the trustees postponed the sale. Appellant did not request more time. Had he done so, no doubt the

trustees would have granted it. Appellant had ample time to submit a comprehensive bid, which he now claims was the best bid. Absent a request for more time, the contention is without merit.

10. Appellant contends he and Reed & Lunsford offered more for the properties than Kirkwood et al. The bids were as follows:

Kirkwood et al. ................................$11,000,000

$2,500,000 to be paid in cash and $8,100,000 in deferred payments extending over a period of 18 years, and secured by a mortgage on the properties purchased.

Appellant .......................................$ 8,001,000

All of which sum was to be paid in cash within sixty days after said offer was accepted, and in addition thereto he offered to lease the real estate and property used in connection with the operation of the newspaper plant and appurtenances thereto for a period of 20 years at the price or sum of $100,000 per year, with an option to purchase the real estate for a total consideration of $2,000,000. With the bid appellant deposited his check for $200,000, and it was stipulated in the bid that upon the payment of $800,000 appellant was to have possession of the property.

Reed & Lunsford ...............................$13,000,000

$8,000,000 in cash at the time of delivery, and $1,000,000 in ten years from date, with interest at the rate of 6% per annum, secured by a mortgage on the real estate and buildings; $2,000,000 at the rate of $200,000 per year for the first ten years, payable out of the earnings, subject to sinking fund requirements but before payment of any dividends to the purchaser; and $2,000,000 at the rate of $100,000 per year, beginning the 11th year after the acquisition of the property by the publishers, payable out of the earnings and subject to fixed charges and dividends on 100,000 shares of common stock at $5.00 per share.

On the face of the bids Kirkwood et al. offered the best price. However, appellant contends $1,000,000 should be added to his bid for the reason the bid of Kirkwood et al. covered all the bills and accounts receivable belonging to the newspapers, whereas he did not bid on those items, for the reason the trustees stated in the "form" furnished to bidders that said items would not be sold.

It was stated in the "form" that all unpaid advertising and circulating accounts receivable at the time of the transfer should be considered as a part of the assets offered for sale, but all other accounts, bills receivable and choses in action should be and remain the property of the trustees.

It is alleged the accounts receivable sold to Kirkwood et al. were of the value of $1,000,000, but there is no allegation of the value of either the accounts receivable offered for sale or accounts receivable not offered for sale. It is not alleged the newspapers owned accounts receivable other than those offered for sale. It may be the exception was unnecessary. By the phrase "unpaid advertising and circulating accounts" the trustees may have intended to include all accounts, notes receivable and choses in action belonging to the newspapers, and may have intended to accept from the sale only the accounts receivable and choses in action of the other property of the trust estate. Such was the understanding of Reed & Lunsford and Kirkwood et al., for their bids covered all bills and accounts receivable and choses in action belonging to the newspapers. Appellant did not bid on any of the accounts and notes receivable, so the fact that he understood certain accounts, bills receivable and choses in action were not offered for sale is of no consequence. Even if the trustees did except certain property in the "form" furnished to bidders, they could change their minds and accept any bid offering the best price and the best terms, although the bid included property belonging to the newspapers not offered for sale.

Appellant also contends $500,000 should be added to his bid for the reason (as stated by appellant) Kirkwood et al., shortly prior to July 9, 1926, purchased a large quantity of paper, ink and other supplies not needed that said property might be on hand and transferred to them on the acceptance of their bid. This contention is not mentioned in the petition, and there is nothing in the record to indicate in the least degree that Kirkwood et al. were guilty of such conduct.

Appellant also contends $2,000,000 should be added to his bid for the reason he did not offer to buy the real estate and it would remain the property of the trustees. Of course, if he would not buy the real estate, they could not sell to him and they would still own the property.

We are unable to justify an inflation of appellant's bid on these contentions. Even if appellant made the highest bid, the trustees could not accept it, for they were directed to sell the property and were without authority to tie up the real estate under an option for twenty years.

It is alleged the trustees were without authority to sell the accounts receivable belonging to the newspapers. This contention is not mentioned in the briefs, and we assume it is abandoned.

Reed & Lunsford offered $9,000,000 for the property. They also offered to pay $4,000,000 out of the earnings of the newspapers, above expenses and certain dividends. These payments were unsecured and without interest. It is doubtful if the trustees had authority to sell on such a contingency. Certainly they could, in the exercise of their discretion, refuse the bid.

The deferred payments under the bid of Kirkwood et al. were secured by mortgage, and the trustees, on default, could take the properties.

On the argument it was admitted five other bids were received, the amount and terms of which are not stated.

11. It is alleged the trustees refused to make known the details of any of the bids. Appellant stipulated in his bid, as follows:

"This offer is in strict confidence to the trustees only in person, not to be divulged or given publicity in any way unless and until accepted, and I would be damaged by the contents hereof being divulged or becoming known to any person other than the trustees."

The other bidders may have so stipulated, and appellant is in no position to complain if the trustees refused to publish the contents of the bids. Only the trustees had the power to pass judgment on the bids.

It is neither alleged demand was made to inspect the bids nor that the trustees did not comply with the following direction of the will:

"The university trustees shall keep complete and correct books of account under the name of 'The William Rockhill Nelson Trust' showing all transfers of every kind pertaining to the trust estate. They shall make to the board of university presidents at least annually and as often as may be requested by the president of any one or more of said universities, a detailed statement in writing of the assets, income, rents and disbursements of said trust estate. All such statements shall be at all reasonable times open to the inspection of the public and may be by the board, if it thinks proper, printed and distributed at the expense of the trust estate."

It was not the duty of the trustees to publish the details of the bids. Their duty was fixed by the above clause of the will. If the bid of Kirkwood et al. was the best price and the best terms obtainable, neither appellant nor the public could be interested in the details of the bids.

The effect of this contention is an insistence that appellant should have been permitted to be of counsel on the consideration of the bids.

12. It is alleged the trustees refused to consider the bids of Reed & Lunsford and appellant. The conclusion is not supported by the allegation of any fact. It may be appellant only intended to charge that the trustees by accepting the bid of Kirkwood et al. thereby refused to consider other bids; if so, the charge amounts to nothing. As stated, the trustees were without authority to accept appellant's bid, and there is doubt about their authority to accept the bid of Reed & Lunsford. If they could not accept the bids, there was no duty cast upon them to give consideration to the details of the bids.

The testator had the right to lodge with the trustees the power to manage and sell the property, and, absent fraud, mismanagement or incapacity, the courts are without authority to interfere. [Haydel v. Hurck, 72 Mo. 253; State ex rel. v. Rusk, 236 Mo. 201, 214, 139 S. W. 199; Sandusky v. Sandusky, 265 Mo. 219, 234, 177 S. W. 390; Shelton v. King, 229 U. S. 90; Palmer v. Banker's Trust Co., 12 Fed. (2d) 747, 755; Loft v. Seymer, 129 Atl. 911 (Md.); 26 R. C. L. Title Trusts, sec. 234, p. 373.]

There is no allegation that the bid of Kirkwood et al. was inadequate, or if the sale was set aside and the properties resold they would bring a higher price. It is not alleged appellant or others would offer more for the properties, and, absent a showing the price is inadequate and that a resale would probably result in a higher price, the sale should not be set aside. [Kramme v. Mewshaw, 128 Atl. (Md.) 468, 474; Morrison v. Burnette, 154 Fed. 617, 625.]

13. It is argued the security given by Kirkwood et al. is inadequate, for the reason the physical properties are of the value of only $2,000,000. The value of the property is not limited to the physical properties, as evidenced by the bids of appellant and Reed & Lunsford. It was the duty and within the discretion of the trustees to pass upon the adequacy of the security.

Thus, it appears the petition does not state a cause of action. It contains only conclusions and opinions of the appellant.

14. Respondents insist appellant is before the chancellor with unclean hands. Having disposed of the case, we will spare ourselves the task of ruling on the question.

There is nothing in the record tending to show that Kirkwood et al. used their position to further their interests as prospective purchasers of the properties. The trustees in selling the properties carefully guarded the interests of the public, dealt fairly

with all concerned, and obtained the best price and the best terms for the properties.

The judgment should be affirmed. It is so ordered. All concur, except *Gentry, J.,* not sitting.