## Greenway et al. v. Irvine's Trustee et al.

May 19, 1939.

W. J. Baxter, Judge.

Grant E. Lilly for appellants.

J. J. Greenleaf and Ross & Ross for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

This appeal involves the consideration of the last will of Elizabeth S. Irvine, by which she disposed of "Irvinton," a pretentious mansion house, on a lot of ten or more acres, within the corporate limits of Richmond, Kentucky, and the construction of the will of her husband, who predeceased testatrix. "Irvinton" had been owned by the father of testatrix, later by her husband, she taking title thereto under the husband's will.

Appellants are G. C. and James Greenway, Sarah Keller, and John S. Greenway, infant, by his guardian, heirs-at-law of William Greenway, who died in 1928. Appellees are John W. Crooke, executor of and trustee under Mrs. Irvine's will; the Kentucky Medical Association, Kentucky State Board of Health, United States Public Health Service, and Robert Sorey, he being in charge of a hospital maintained on the premises in controversy. The City of Richmond is an appellee.

Mrs. Irvine's will (holographic) is quite lengthy, a transcription covering more than twenty-five typewritten pages; its length, in a measure due to numerous repetitions, apparently made for the purpose of emphasis, and was written June 1, 1915. Mrs. Irvine died November 5, 1920; the will was probated December 6, 1921. There is no question of the validity of the will because of lack of mental capacity, or the exercise of untoward influence. All parties seem to agree that testatrix was a woman of the highest character, intelligent to an exceptional degree, and as is gathered from the will, proud of her ancestral lineage. Her will gives some interesting family history, calling attention to the fact that her mother was the oldest child of Dr. Ephriam McDowell, "The Father of Ovariotomy," whose wife was a daughter of Isaac Shelby.

She recites:

"My long life has been passed in this beautiful city, at the foot of the hills. God has pleased to prosper me here. * * * Many of my ancestors are sleeping in our beautiful 'City of the Dead.' I alone remain yet a little while. * * * It seems therefore appropriate that I show my appreciation by perpetuating the ancestral name of Irvine, (testatrix' maiden name) by making the following bequest:"

To the Medical Society of Kentucky she left the use of her home "Irvinton" to be called forever, "The David Irvine and Ephriam McDowell Memorial," to be converted into a "memorial of medicine and surgical treatment of patients." She then describes the portion devised as lying in Richmond, between 4th Avenue and Second Street, and in this clause first uses the word "hospital," saying that she bequeathes and donates the same "to the uses and purposes of said hospital." She writes: "Just here I will be more explicit as to a helping of the support of this grand charity—for an endowment fund of the memorial." She then relates the ownership of a valuable lot in Kansas City, under lease for a long period at $2,000 per year, payable quarterly, which was given to the use of the Memorial, and the property was to go to the Memorial at the expiration of the lease.

Testatrix named the appellee, John W. Crooke, and D. Irvine White as executors, and as we read the will, intended that they should qualify and act as trustees. Mr. Crooke qualified and is acting in both capacities; Mr. White, a non-resident, did not qualify. Testatrix also named two advisory trustees, who were non-residents. There were many directions, conditions, restrictions, and limitations in the writing.

While the building at Irvinton was to be used as a hospital, patients were to pay for treatment and services, except that a limited number of charity patients were to be admitted. No foreigners, colored persons or soldiers were to be admitted; no one afflicted with an eruptive or contagious disease was to be treated therein. There were to be no public gatherings, picnics, chautauquas, shows or meetings to be held or conducted on the grounds. Each and every room in the building was to be appropriately marked in memory of some member

of the Irvine family, and a handsome monument to be erected on the grounds. These· are given as examples of the numerous conditions and restrictions contained in the will.

The devise and bequest of the Kansas City property and the yearly rental failed, because of a holding of the courts of Missouri, to the effect that under the statutes of that State Mrs. Irvine's will was not subject to probate. White v. Greenway, 303 Mo. 691, 263 S. W. 104.

We come now to the pleadings and must state that we have had difficulty in considering them in an orderly manner. It appears that the pending matter is a continuation of the case of Greenway v. White, infra, petition in which was filed in February, 1921, involving other matters, and which was decided on appeal to this court in March, 1922, reversed and remanded with directions to enter judgment in accordance with our opinion. Whether this case went off the docket below is not shown. Many of these pleadings were filed in that case, involving certain features of the wills of William Irvine and testatrix. However this may be, and regardless of when, why or how the pleadings were filed, or were made part of this record, we have, together with the transcript on this appeal, observed the files in the 196 Kentucky case, infra.

The matter before us was begun by the trustee and executor filing an amended petition, in which he recites that since the filing of an original petition, and after diligent inquiry and effort, and being advised, he had ascertained and concluded that there had never been but one recognized Medical Society or Association in Kentucky, the original having been the Society created in 1851, but succeeded finally by the Association created in 1929. Upon such knowledge and advice he had been able to make satisfactory arrangements with the State Medical Association, as successor to the original Kentucky Medical Society, through conferences and agreements, by which the members or a committee of the Medical Society, with his approval, have been enabled to make satisfactory arrangements with the Kentucky State Board of Health, and the United States Public Health Service, to establish and maintain, and there has been established since 1926, and is being maintained at Irvinton, under the supervision of the U. S. Government, a free hospital for the treatment of trachoma. In

his original petition he had asked advice, due no doubt on his part, as to whether he could make a satisfactory arrangement with the medical association.

It is plead that it has been proven possible, under such arrangement, for him to carry out the provisions of Mrs. Irvine's will relating to the maintenance of a memorial hospital at Irvinton. Having thus plead, the trustee asked the court to make suitable and appropriate orders and directions for the continued exercise of his trust, which the court did not do.

By way of answers, counterclaim and cross-petition, appellants first set up, in appropriate pleadings, their right to the Irvinton property. They then alleged the violation of some twenty or more of the restrictions, and failure to carry out many conditions imposed upon the trustee or donee of the property. It is unnecessary to discuss them, but the most flagrant violation charged was that of operating a hospital for the treatment of trachoma, when the will prohibited the admittance of any person afflicted with an eruptive or contagious disease, it being alleged that trachoma was and is a contagious disease. Such cases are admittedly treated.

The power of the Medical Association to hold and in conjunction with the State Board of Health and the Federal Health Agency to thus operate the memorial was challenged. It was upon these failures and violations of the terms of the will, and the lack of legal capacity on the part of those maintaining the hospital, to thus hold and maintain same, that appellants pitched their right to a reversionary interest, under the will of William Irvine. In short, they alleged a complete failure of trust, and a resulting "reverter." The court upon submission dismissed appellants' claim.

Appellants trace their right of title to the property, or so much as was devised for memorial hospital purposes, to the will of William Irvine. He executed his will in 1885, and died in 1891. So much of his will as is necessary to consider in determining their alleged rights to "Irvinton" is as follows:

"(2) It is my will that my wife, Elizabeth S. Irvine, shall have all of my estate, real, mixed and personal, as my sole heir. * * *

"(3) In the event, however, that she, my wife, dies intestate and without making disposition of my

estate, then I provide that my estate shall be divided as follows:

"(4) I give to Alice W. Greenway of Hot Springs, Arkansas, my residence in the town of Richmond, Kentucky, known as 'Irvinton,' during her natural life, and at her death to her youngest son, now known as William Irvine. * * * In the event of the death of said William Irvine, *then* before he is 21 years of age, I give Alice W. Greenway the power to name which one of her children shall inherit 'Irvinton.'

"(5) * * * Now, by way of explanation, I make all of the above legacies subject to the approval, alteration or change in part or the whole of my wife, Elizabeth S. Irvine, except the legacies to my half brother, John S. Harris. This I require to be paid at my death."

Alice W. Greenway died prior to the death of Elizabeth Irvine. William Irvine Greenway, the son, died subsequent to the death of testatrix. The appellants are his children, and one grandchild.

The controlling question to be determined here is settled by this court's opinion in Greenway v. White, 196 Ky. 745, 246 S. W. 137, 138, 32 A. L. R. 1385, in which we construed so much of the will of William Irvine and testatrix as had relation to a devise in the William Irvine will of a farm of about 200 acres to David Irvine White during his natural life, after his death to go to his second son, provided he drop the name "White" and take that of his grandfather David Irvine. Testatrix devised this property, by residuary clause, to Wm. Greenway.

In testatrix' will she referred to the clause of her husband's will which gave her the power to change any legacy therein. She said, "I am empowered by my husband's William Irvine's last will to make any changes in that instrument I might desire, and I shall proceed to do so." It must be noted that the devise of the life estate to David Irvine White occupied a like situation in William Irvine's will as did the devise to Alice W. Greenway, that is, it was to be of effect only if testatrix "dies intestate, and without making disposition of my estate."

In Mrs. Irvine's will she made no specific reference

638

to the farm, as she did to the Irvinton property, but at three different places in her will she named the appellant in the Greenway v. White case, supra, as her residuary legatee. There the contest concerned the devise in William Irvine's will to David White. Appellant (Greenway) contended that William Irvine had devised all his property in fee to his wife, and that any subsequent attempt "by him therein to confer the property upon others with the power in his wife to make a different appointment of it by her will was void, and that as residuary legatee of Mrs. Irvine he is entitled to the farm; but, if mistaken in this, then (2) that Mrs. Irvine did legally exercise the power of appointment conferred on her by her husband's will in the execution of her will and that as residuary legatee therein he is entitled to the farm."

Appellees combatted each of these contentions, and the lower court adjudged that under the will of William Irvine, David White took a life estate with remainder to the son, who had prior thereto changed his name to David Irvine, a condition precedent to his right to take. This judgment of the lower court was reversed with directions to adjudge the title in appellant, Greenway.

In an opinion which manifests a careful consideration of the contentions, and writing at length on the rules of construction, and pointing to the rulings of this court in numerous cases cited, dealing with appointments and powers under wills, and which are referred to herein without quoting, this court held substantially as follows:

That Mrs. Irvine was "not restricted either as to the subject-matter of the power of the beneficiaries whom she might select, and there can be no doubt that as to all of the property to which the power attached she possesed a general and not a special or qualified one. Her will was sufficient (including the residuary clause) to cover and pass title to all the property over which she had testamentary power, in which case, under the provisions of Section 4845, [Kentucky Statutes] supra, the general power of appointment, given her by her husband's will, will be deemed to have been exercised, unless a contrary intention appears from her will. * * *"

In the present case there can be no doubt of intention, since the greater portion of testatrix' will is taken up in devising Irvinton for the purpose expressed. We

said in the case supra, "We are convinced that from the entire will of Mrs. Irvine there appears not only no 'contrary intention' * * * but, on the contrary, there appears an intention," to exercise the power under her husband's will. Much was said as to the right of Mrs. Irvine to exercise the power of appointment conferred upon her without first revoking the appointment made by her husband, the donor of the power.

What was discussed therein on this point had relation solely to the devise under the residuary clause of testatrix' will. After citing certain cases which were said to be consonant with our statutes, we held that "a power of appointment, which may be exercised by will may be executed by a residuary clause in the will of the donee, unless a contrary intention appears from his will, but that a power so executed will not operate to revoke an appointment made by the donor to take effect in the absence of the execution of the power. We will not stop to discuss the soundness of that rule, but will accept it as true, in which case it is quite clear from this record that Mrs. Irvine did revoke by her will the prior appointment of the contested farm by her husband to the appellees." This being the case, the rule as applied to the question as to what passed under a residuary clause, is bound to apply where, as in this case, there was a specific devise.

The case, supra, is so clearly conclusive of the claim of appellants, as they have based and presented same in their pleadings, pitching that right on the provisions of the will of William Irvine with reverter upon the failure of the trust under Mrs. Irvine's will, that no further discussion, or citation of authorities, is necessary.

This brings us to a consideration of the propriety of the court's ruling, or final conclusion, with respect of the special demurrer which challenged the capacity or right of appellants to attack the devise on the grounds that the hospital was not being properly operated, in strict, or even substantial, compliance with the provisions of Mrs. Irvine's will. Having failed to show that they can take by "reverter" under the will of William Irvine, their suit, insofar as it relates to the operation of the hospital, must fail.

At the outset we are impressed with the statement in briefs for appellants that it is not their purpose to

take to themselves title to "Irvinton," but their desire is that the trust be carried out in accordance with the will of testatrix. While this effort must be characterized as commendable, it is the general law that failing to show property interest in and to themselves, or interest as beneficiaries of the trust, they are precluded from maintaining action to have the trust declared void, and may not dictate its enforcement.

The general rule is laid down in Vol. 2, p. 391, "Trusts" in Restatement of the Law, thus:

> "A suit can be maintained for the enforcement of charitable trust by the Attorney General or other public officer or by a co-trustee, or by a person who has a special interest, but not by persons who have no special interest or by the settlor or his heirs, personal representative or next of kin. * * * A suit for the enforcement of a charitable trust cannot be maintained by persons who have no special interest in the enforcement of the trust. The mere fact that as members of the public they may benefit from the enforcement of the trust is not sufficient ground to entitle them to sue.

> "A suit for the enforcement of a charitable trust cannot be maintained by the settlor or his heirs or personal representatives as such. They can maintain a suit, however, or a claim adverse to the trust.

> "The settlor or his heirs or personal representatives can maintain a suit to recover the trust property on the ground that the charitable trust has failed and that they are entitled to the property by way of resulting trust or reverter or right of entry for condition broken. So also, if there is a valid gift over upon the failure of the trust, the person to whom the gift over is made can maintain a suit to recover the property upon the ground that the trust has failed. In these cases the Attorney General is a necessary party."

In Bogert's Trusts and Trustees, Vol. 2, Section 415, the rule is thus stated:

> "The settlor and his successors in interest, as such are generally held to have no legal interest in the trust, unless there is an express reservation of some power or privilege. If the trust, charitable or

private, is created without reservation or exception, it amounts to an absolute gift of the legal interest to the trustee and the equitable interest to the beneficiaries. There is no propery interest left in the settlor or his heirs, devisees or next of kin or legatees. He may have a sentimental interest during his life in seeing that his wishes are respected, as may his successors after his death, but no financial or other advantage which the law recognizes will accrue to the settlor or his successors from the trust execution and hence neither he nor they are as a general rule permitted to sue the trustees to compel them to carry out the trust. \* \* \*

"There are, however, several cases in which a diametrically opposite result has been reached, and the settlor, or his successors have been allowed to bring a suit to enjoin a diversion of the property or to set aside a wrongful sale or to procure a decree of enforcement. These decisions seem difficult to support. They permit a sentimental interest to be sufficient basis for enlisting the aid of the court."

Under the last quoted paragraph the author has given only two supporting cases, one of them our own case of Tate v. Woodyard, 145 Ky. 613, 140 S. W. 1044, which is annotated under the clause "or to set aside a wrongful sale."

In that case it appears that Woodyard had conveyed a certain lot to be used by a Masonic Lodge for the purpose of building a church, lodge-room and a graveyard. The officers of the lodge erected the building and established a graveyard. However, the entire lot apparently not being necessary for the purposes mentioned, the officers sold a portion to Owens, and he to Tate, who was preparing to build. Woodyard, the settlor, instituted suit to cancel the deed, and on hearing the court did so, and this court upheld the decree, chiefly on the ground that the trustees had no authority to dispose of any part of the land except for reinvestment purposes, and in the manner provided by Section 317, Kentucky Statutes.

It is interesting to note that the court did not hold that the property reverted to Woodyard, but held that neither Owens nor Tate had any interest in the land under their deed. The effect of the judgment was to uphold the trust, but not to put the title back in the settlor.

This suit may have been, so far as the opinion shows, one to enforce the beneficent objects of the founder of the charity, but it went much further, hence the case does not throw any light on the question presented here, since the question, though it may have been raised, was not discussed in that case.

We have examples of the principle that the settlor or his successors have a right to sue for the purpose of determining whether a trust has failed, and if so, for enforcement of their rights, but in all of them which we have observed, there existed in connection with the gift or trust a remainder or reversionary interest in case of a failure of the trust. There may be pointed out as being in this class, Gooding v. Watson's Trustee, 235 Ky. 562, 31 S. W. (2d) 919, 924, wherein we held that upon failure of the trust, the heirs-at-law of the settlor were entitled to the trust property. The question here presented was not discussed in the case cited, the court being satisfied with saying: "The interest of the appellants as remaindermen is such as to enable them to maintain the action at this time."

In the case of Trustees Stewart C. S. Fund v. Lewis, Supt., 234 Ky. 286, 28 S. W. (2d) 27, 30, heirs of the settlor and his personal representative sued to have the trust declared void in part because of a failure. The court held that in respect of certain parts of the trust there was a failure, and to that extent the funds reverted. It will be noted, however, in the deed creating the trust, or in one of them, there was a clause providing reverter in case of failure, "to myself if living, if not then to my legal representatives."

The law is well settled that the beneficiaries of a benevolent or charitable trust have a right to maintain a suit to enforce the trust or to prevent diversion of the funds. This doctrine is recognized in earlier cases in this jurisdiction. Baptist Church v. Presbyterian Church, 18 B. Mon. 635. In Chambers v. Baptist Educational Society, 1 B. Mon. 215, while laying down the general principles upon which and by whom a suit to enforce a charitable or benevolent donation might be maintained, we held that Chambers, who was a subscriber to the enterprise, and had borrowed a sum from the trust fund, was, as to any rights under the trust, to be placed in the class of private individuals. He did not claim that he had a vested interest in the trust property,

or that he was a beneficiary under the trust. His classification was said to "apply equally to a large class of individuals, any one of whom might, with equal propriety, file his separate bill, and greatly embarrass the management of a fund donated by another." Insofar as the pleadings go, this may in a mild way be said of appellants, since they have not shown themselves vested with any interest in the trust property, nor do they assert that they are beneficiaries of the trust, nor as having any special interest in its administration. It does not appear in the pleadings in the instant case whether or not the appellants, or any of them, are residents of the Commonwealth, but in the Greenway v. White case, supra, it does appear that they were then nonresidents.

That the beneficiary of a trust has the right to maintain a suit looking to its proper enforcement, or compliance in a substantial manner with the provisions according to the apparent intent of the settlor, but one not having interest may not do so, has been held by many courts in foreign jurisdictions. Perhaps one of the best reasoned cases is Dickey v. Volker, 321 Mo. 235, 11 S. W. (2d) 278, 62 A. L. R. 858. This case is voluminously annotated. Among the cases cited are Jenkins v. Berry, 119 Ky. 350, 83 S. W. 594, 26 Ky. Law Rep. 1141, and same case in 122 Ky. 311, 92 S. W. 10, 28 Ky. Law Rep. 1224, and the two Kentucky cases above cited. The citations bearing on both points are so numerous that we choose to refer the reader to the case and its annotations, rather than add them at this point.

The Dickey v. Volker case carries annotations of opinions of various courts holding that the donor or his heirs are not permitted to maintain suit to control, or have the trust declared null and void, and others holding that they may maintain and prosecute such suit, but in the latter class it is, as a general rule, held that there must appear a remainder or reversionary interest. The commentator cites only two or three exceptional cases, among which is Coleman v. O'Leary's Ex'r, 114 Ky. 388, 70 S. W. 1068, 24 Ky. Law Rep. 1248; with regard to that case it is remarked:

"That the provision of a will by which the testator directed his executor to expend the sum of $1,000.00 for masses for himself, mother and aunt, may be enforced by the courts upon the application of the *heirs* is supported by the language in the opinion

in which the provision of the will was sustained, but the question as to how it was to be enforced was not directly presented.''

As we read the case, the question as to whether the plaintiffs had the capacity to sue looking to enforcement was not therein presented. But that case is not authority here, because we have shown that appellants have no remainder or reversionary interest in the trust estate.

The general rule is that where property is devised for charitable uses, the donor or a residuary legatee has no interest in the trust property, save as one of the public, and can only question the activities of the holder of the trust by a bill preferred on behalf of himself and all others similarly situated, in conjunction with the Attorney General representing the public. Dickey v. Volker, supra. Among cases cited in point are MacKenzie v. Presbytery of Jersey City, 67 N. J. Eq. 652, 61 A. 1027, 3 L. R. A., N. S., 227; Kemper v. Lane Seminary, 17 Ohio 293; Sanderson v. White, 18 Pick., Mass., 328, 29 Am. Dec. 591; Burnham's Petition, 74 N. H. 492, 69 A. 720; Strong v. Doty, 32 Wis. 381; Association for Relief R. A. I. F. v. Beekman, 21 Barb., N. Y., 565; Green v. Blackwell, N. J. Ch., 35 A. 375; Atty. Gen. v. Wallace's Devisees, 7 B. Mon. 611.

In the light of the cases cited on the direct and collateral points, it seems clear to us that since the parties appellant have not satisfactorily shown any interest in remainder, or any reversionary interest in the property, but on the other hand the Greenway v. White case makes it clear that they have no interest, as claimed, under the William Irvine will, they are without power to attack, or direct the execution of the trust, and going further, we may say they are powerless to invoke the aid of chancery to have the court annul, control or direct the trust. Whether or not the Attorney General has the power to maintain a suit to seek the proper administration, as has been held in the Wallace and Berry cases, supra, we need not now decide.

One other point may be mentioned. While there was no remainder clause in Mrs. Irvine's will, or any language which could be construed as intending a reverter, for or to the appellants, there appears in three places in the will language which may be (but is not) construed as providing for what testator calls ''reverter'' to the City of Richmond. Even though it be con-

ceded that appellants have some rights under the William Irvine will, there yet stands the uncontested question as to the rights of the city.

True, in this case the city demurred to the pleadings of appellant, and its demurrer was sustained. However there was no pleading of any sort by the city responsive or antagonistic to the pleadings of the appellees, defendants below. No issue was in any manner raised by the city as against the claims of the trustees or the parties holding and maintaining the memorial property. In this state of case any possible claim of the appellants would be remote, to the extent that the City of Richmond would, under proper pleadings, have the right to undertake to establish its claim under the terms of Elizabeth Irvine's will, a question upon which, because of the state of the pleadings, we venture no opinion or suggestion.

We may say that it is our view that the court was correct in overruling the special demurrer interposed by the trustee and those operating the hospital, because appellants did have the right to test the question as to whether or not they were the reversionary owners of any interest in the trust property under the will of William Irvine.

Having failed to establish such right, they thereby became incapacitated to maintain further proceedings looking to the proper conduct of the memorial, or to have the trust declared ended because of failure of the trust. Therefore, though the chancellor did not advance it as his reason for having done so, he nevertheless properly dismissed the answer, cross-petition and counterclaim to the petition of Crooke's.

Judgment affirmed.